Ada Sandra KOPF, Personal Representative of the Estate of Anthony John Casella, Plaintiff–Appellant,

v.

James SKYRM; Prince George's County, Maryland, a body corporate and politic; Joseph P. Wing, Corporal; Steven Kerpelman, Corporal, Defendants–Appellees,

and

Other Unknown Officers of the Prince George's County Police Department, Defendants.

No. 92–1566.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 4, 1993.

Decided May 7, 1993.

Terrell Non Roberts, III, argued (Christopher Griffiths, on brief), Roberts & Wood, Riverdale, MD, for plaintiff-appellant.

Sean Daniel Wallace, Associate County Atty., argued (Michael P. Whalen, County Atty., Michael O. Connaughton, Deputy County Atty., and Alan E. D'Appolito, Associate County Atty., on brief), Upper Marlboro, MD, for defendants-appellees.

Before ERVIN, Chief Judge, and HALL and PHILLIPS, Circuit Judges.

## OPINION

K.K. HALL, Circuit Judge:

Ada Kopf appeals a judgment entered after a jury verdict in favor of the defendant police officers and a subsequent summary judgment for the defendant county in this 42 U.S.C. § 1983 action alleging excessive use of force during the arrest of Kopf's deceased son. We reverse and remand for a new trial.

## I.

At midnight on February 21, 1988, a white male with a handgun robbed a pizza take-out shop in Hyattsville, Maryland. One hundred dollars were stolen. Witnesses recorded the license number of the van in which the perpetrator had fled the scene, and all local police were promptly on the lookout for it.

Within minutes, Hyattsville city police spotted the van and gave chase. The vehicle stopped, and its occupants—Joseph Corcoran (the actual stickup man), Anthony Casella, and Tammy Obloy—fled on foot. Corcoran fell, injured his leg, and was easily apprehended. Inasmuch as Corcoran did not have the gun used in the robbery, the arresting officers concluded that the other two suspects might have it. Corcoran had actually thrown the gun out of the window of the van.

Casella and Obloy hid behind a garage in the backyard of a nearby house. The hiding place was an extremely narrow passage between the wall of the garage and a fence around the yard. One end of the passage was obstructed by a post and the other by a woodpile.

Prince George's County officer Joseph Wing arrived with his police dog "Iron." After one unsuccessful track around the neighborhood, Iron located Casella and Obloy's hiding place.

According to Wing, he announced in a loud voice that he would release the dog unless the suspects surrendered. Obloy testified that she heard no warning.

Wing released Iron. He testified that he did so because it was more reasonable to subject the dog rather than an officer to the possibility of being shot. Iron ran to the garage and went into the passage. Wing followed. With his flashlight, Wing could see Iron bite Obloy. Casella kicked Iron. According to Obloy, Casella yelled to the officers to tell them she was pregnant and to get the dog off of her. Wing did not recall Iron. Rather, he repeatedly ordered Casella and Obloy to raise their hands, but they did not. Iron released Obloy and began biting Casella.

Two more county policemen, Steven Kerpelman and James Skyrm, arrived. They climbed over the woodpile and grabbed Casella; the dog continued to assist by biting. Casella was screaming and flailing his arms

around. Skyrm could see that Casella did not have a gun in his hands, and he holstered his own weapon and grabbed his slapjack. He testified that he struck Casella a number of times, and that he may have hit him on the head.

By this time, Wing also knew that Casella was unarmed. Still, he did not order Iron to release; instead, he ran around the garage to the more accessible (woodpile) end in order to assist Kerpelman and Skyrm.

Iron began biting Casella in the thigh and groin. Casella was flailing his arms and legs around. According to Wing, Casella's arm hit him, and he responded with a slapjack blow to Casella's upper body, unintentionally striking Casella's head. According to Obloy, just before the first blow struck Casella's head, an officer said angrily, "Don't touch my dog." Obloy was subdued and removed from the woodpile. Finally, Wing commanded Iron to release Casella.

From a hunched over position between standing and kneeling, Casella lunged forward. Kerpelman interpreted this movement as an attempt to grab Skyrm's holstered gun. Kerpelman struck Casella with his slapjack, again in the head, again, according to the officer, unintentionally. At some point, one of Casella's flailing blows struck Kerpelman, causing a minor cut on his forehead.

Soon the officers had pulled Casella out into the open yard. The struggle (or, according to the plaintiff, the beating) continued. Kerpelman struck Casella with his flashlight and, after it broke, his slapjack.

Casella was eventually reduced to senselessness. Emergency medical personnel were summoned to the scene. According to one of the paramedics, Wing walked up to Casella as he lay on a stretcher and said, "You son of a bitch, you kicked my dog." Wing denied making this statement.

Casella was transported by ambulance to a local hospital. On arrival, he was awake but confused and combative. Because these symptoms could be produced by an acute drug overdose, particularly of PCP, a drug test was performed. The result was negative.

An examination for traumatic head injuries proved more fruitful. At trial, one of the treating physicians identified five different lacerations on photographs of Casella's scalp. His skull was fractured, and he had a epidural hematoma, which required immediate surgery. Dog bites adorned Casella's lip, right arm, chest, knee, thigh, and scrotum. The five-inch-long thigh wound was deep and involved muscle. The skin covering Casella's scrotum was avulsed "in a jagged fashion," though the scrotal sac was intact.

Following the brain surgery and inpatient recuperation, Casella spent five months in a brain injury rehabilitation program at Mount Vernon Hospital. He suffered several cognitive deficits from his head injuries, the most serious of which was aphasia—an impairment in the ability to express oneself verbally. Though he made progress, he never fully recovered.

Casella pled guilty to armed robbery and was sentenced to state prison. He later brought this suit against Wing, Kerpelman, Skyrm, and Prince George's County. He alleged a claim under 42 U.S.C. § 1983 against all defendants and pendent state-law claims for battery and negligence.

On July 31, 1989, Casella was attacked in prison and killed. Ada Kopf, his mother, is his personal representative and was substituted as plaintiff.

Following discovery, the district court granted summary judgment for the defendants. Kopf appealed, and this court reversed and remanded. *Kopf v. Wing*, 942 F.2d 265 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1179, 117 L.Ed.2d 423 (1992).

On remand, the district court bifurcated the claims against the individual officers from the claims against the county and set the former for trial first. Then, in the central ruling on appeal, the district court ruled *in limine* that two expert witnesses Kopf expected to call—Thomas Knott and Robert diGrazia—would not be permitted to testify. Kopf sought a writ of mandamus from this court to compel the district court to permit the testimony. We denied the writ. *In re Kopf,* No. 92–1033 (4th Cir. Feb. 12, 1992).

A jury trial was held. Because of the total exclusion of her expert witnesses, Kopf was forced to call Wing as an adverse witness and to ask him about the standards for and the particular use of the dog. Wing did not give the answers Kopf would have liked, and she was unable to rebut them. On the use of slapjacks, Kopf introduced a lesson plan for county officers, which stated, "[n]ever strike your aggressor's head, neck, or throat." The court permitted the author of this report to contradict it with testimony that the head was not a "primary target area," but "there may be a time in [a] police officer's career where a blow to the head is necessary." Again, Kopf's experts were not permitted to rebut these assertions.[1]

The jury returned a verdict for the defendants. On the county's motion, summary judgment was then entered for it as well.

Kopf appeals.

## II.

## A.

■ Fed.R.Evid. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Article VII of the Federal Rules of Evidence eliminated many formalistic barriers imposed by the common law on the introduction of opinion and expert testimony. Rule 702 is broadly interpreted, and helpfulness to the trier of fact is its "touchstone." *Friendship Heights Associates v. Koubek,* 785 F.2d 1154, 1159 (4th Cir.1986). Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror. *Persinger v. Norfolk & Western Railway Co.,* 920 F.2d 1185, 1188 (4th Cir.1990) (testimony about how difficult it is to lift heavy things is not "helpful" and is thus excludable). Even then, the erroneous admission of such testi-

mony is usually harmless: an astronomer's explanation that the days are longer in the summertime may not assist the jury, but it is also not likely to cause an erroneous finding of fact. "Trouble is encountered only when the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." *Scott v. Sears, Roebuck & Co.,* 789 F.2d 1052, 1055 (4th Cir.1986).

■ The witness' qualifications to render an expert opinion are also liberally judged by Rule 702. Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed: knowledge, skill, experience, training, or education. *Friendship Heights,* 785 F.2d at 1159. Where the expert's qualifications are challenged,

> the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered. One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.

*Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 799 (4th Cir.1989), *cert. denied,* 493 U.S. 1073, 110 S.Ct. 1120, 107 L.Ed.2d 1027 (1990).

■ The subject matter of Rule 702 testimony need not be arcane or even especially difficult to comprehend. If, again in the disjunctive, the proposed testimony will recount or employ "scientific, technical, or other specialized knowledge," it is a proper subject. There is no gap between the "specialized knowledge" that is admissible under the rule and the "common knowledge" that is not. The boundary between the two is defined by helpfulness.

The expert may testify "in the form of an opinion or otherwise." An opinion is not objectionable simply "because it embraces an ultimate issue to be decided by the trier of fact," Fed.R.Evid. 704(a), though such an opinion may be excluded if it is not helpful to

---

**1.** This testimony was purportedly offered as a firsthand account of the officers' training, rather than Rule 702 expert opinion. The transcript

reveals that the attorneys and witness had a difficult time maintaining the distinction.

the trier of fact under Rule 702., Even then, the inadmissability of the expert's ultimate opinion does not necessarily banish him from the stand altogether, because his specialized knowledge may still assist the trier of fact in other ways. "An expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts." Rule 702 advisory committee's note.

## B.

■ The plaintiff's proposed experts were Thomas Knott, a retired canine unit trainer for the Baltimore city police and head of that department's canine unit for sixteen years, and Robert diGrazia, former Chief of Police of Montgomery County, Maryland, and Police Commissioner of Boston and St. Louis.

Knott would have testified that Wing's actions were unreasonable and violated accepted police practices. According to Knott, the purpose of a police dog is to locate suspects, not to apprehend or bite them. Inasmuch as several officers were on the scene, all of whom were trained to make arrests, it was improper, in Knott's opinion, to permit the dog to bite and cause serious injury.

Both Knott's explanation of the purpose of a police dog and his ultimate opinion would have directly refuted Wing, who testified that the dog's role was to encounter a dangerous situation in lieu of officers. DiGrazia would have corroborated Knott that the primary purpose of a police dog is to locate suspects; when that mission is accomplished, it is the officers', and not the dog's, role to make the arrest.

On the use of slapjacks, diGrazia would have testified that

> the use of blackjacks or slapjacks by all three officers [was] brutal and excessive. With three officers present to make an arrest, and many more nearby, there was no necessity to strike the suspect. The officers should have grabbed and held Casella without striking him in ·the head. The use of blackjacks to strike the head is potentially lethal and is universally prohibited. The blows delivered to Casella's

head appear to have been delivered with maximum force, causing a skull fracture, with resulting epidural hematoma.... I [do not] agree that the head was the only available area which could be struck. Even if it were, it would not be an appropriate area to strike unless the loss of life was an acceptable method of securing Casella's arrest, which I reject.

## C.

■ The district court held that the excessive force standard—"objective reasonableness"[2]—is comprehensible to a lay juror and that expert testimony would therefore not assist the trier of fact. We review the district court's decision to admit or exclude expert testimony for an abuse of discretion. *Persinger*, 920 F.2d at 1187.

We find an abuse of discretion here. As a general proposition, the "objective reasonableness" standard may be comprehensible to a lay juror. On the other hand, any "objective" test implies the existence of a standard of conduct, and, where the standard is not defined by the generic—a reasonable *person*—but rather by the specific—a reasonable *officer*—it is more likely that Rule 702's line between common and specialized knowledge has been crossed.

The district court seems to have deduced a blanket rule that expert testimony is generally inappropriate in excessive force cases from *Wells v. Smith*, 778 F.Supp. 7 (D.Md.1991). To the contrary, expert testimony has often been admitted in such cases. *Davis v. Mason County*, 927 F.2d 1473, 1484–1485 (9th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991); *Samples v. City of Atlanta*, 916 F.2d 1548, 1551–1552 (11th Cir.1991); *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1551 (11th Cir.1989) (expert testimony concerning expected dog bite ratios in canine units); *Kladis v. Brezek*, 823 F.2d 1014 (7th Cir.1987). Nonetheless, a blanket rule that expert testimony is generally admissible in excessive force cases would be just as wrong as a blanket rule that it is not.

**2.** *Graham v. Connor*, 490 U.S. 386, 396–397, 109    S.Ct. 1865, 1872–73, 104 L.Ed.2d 443 (1989).

The facts of every case will determine whether expert testimony would assist the jury. Where force is reduced to its most primitive form—the bare hands—expert testimony might not be helpful. Add handcuffs, a gun, a slapjack, mace, or some other tool, and the jury may start to ask itself: what is mace? what is an officer's training on using a gun? how much damage can a slapjack do? Answering these questions may often be assisted by expert testimony.

A dog is a more specialized tool than a gun or slapjack. How to train a poodle to sit or roll over is not everyday knowledge and could be explained by an expert in a case where it was relevant. How to train and use a police dog are even more obscure skills. Both Knott and diGrazia were qualified to testify about this specialized knowledge by their long experience.

diGrazia's proffered testimony about the use of slapjacks is a closer issue. A club and the damage it can cause when it strikes a person's head are easily understood by most laymen. Still, diGrazia should clearly have been permitted to testify as to the prevailing standard of conduct for the use of slapjacks, even if he had been precluded from giving an opinion on the ultimate issue of whether the use in this case was reasonable.[3]

The total, *in limine* exclusion of Knott and diGrazia's testimony was an abuse of discretion.[4]

### III.

Kopf also complains about the district court's remarks concerning Casella's participation in the armed robbery[5] and the introduction of evidence concerning his use of cocaine during the weeks before the robbery.

### A.

■ That an armed robbery had occurred is of course directly relevant to the case. As a general matter, more force may be reasonably used in apprehending a violent criminal than a jaywalker. *See Tennessee v. Garner,* 471 U.S. 1, 9–11, 105 S.Ct. 1694, 1700–01, 85 L.Ed.2d 1 (1985). In evaluating the officers' conduct from the point of view of a reasonable officer on the scene, the jury was entitled to know that the officers were confronted with apprehending the participants in a nighttime armed robbery and that they had probable cause to arrest the persons hiding behind the garage.

■ The same cannot be said about Casella's ultimate conviction. If probable cause to arrest is present, the actual guilt or innocence of the arrestee is irrelevant to the amount of force that may be used. Just as the officers' actions ought not be faulted through "the 20/20 vision of hindsight,"[6] so also should they not be absolved by it. Had Casella been the innocent victim of a tragic mistake, his story might have provoked popular consternation or served as grist for an investigative journalist's expose.

But Casella was a criminal. He deserved to be arrested and punished; his story stirs little sympathy, much less outrage, in the crowd. The courts cannot be so impassive. We must always remember that unreasonable searches and seizures helped drive our forefathers to revolution. One who would

---

3. We do not intend to foreclose the district court from admitting diGrazia's ultimate opinion on the use of slapjacks on retrial. We mean only to illustrate that difficult questions of the admissibility of particular portions of a witness' testimony are best considered individually, and the potential inadmissibility of diGrazia's ultimate opinion is not a sufficient basis to wholly bar him from the stand *in limine.*

4. Kopf recasts the exclusion of her experts' testimony as a due process deprivation. There is no reason to reach a constitutional question where the rule of evidence provides her the relief she seeks. As a general matter, the rules of evidence permit a greater array of evidence than would the due process clause alone. Consequently, it

would be rare indeed—at least in a civil case—where the due process clause would require the admission of evidence but admission would not be otherwise proper under the rules.

Kopf also argues that our earlier opinion's reliance on her experts' affidavits in reversing the summary judgment is the "law of the case," and implicitly finds the experts' trial testimony admissible. We need not address this contention.

5. In an introductory statement to the jury panel, the court told it, "Earlier that night Casella had robbed a carry-out pizzeria shop, ...."

6. *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872.

defend the Fourth Amendment must share his foxhole with scoundrels of every sort, but to abandon the post because of the poor company is to sell freedom cheaply.

It is a fair summary of history to say that the safeguards of liberty have often been forged in controversies involving not very nice people. And so, while we are concerned here with a shabby defrauder, we must deal with his case in the context of what are really the great themes of the Fourth Amendment.

*United States v. Rabinowitz,* 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting).

The point of these ruminations is that Casella's guilt of the pizza store robbery is simply not relevant to the excessive force inquiry.[7] We do not mean to say that any mention of his guilt would necessarily have poisoned the whole trial; indeed, we suspect that the jury would have strongly suspected guilt from not hearing otherwise. Nonetheless, the place of prominence Casella's guilt received—the outset of trial—and the prominence of the speaker—the judge—exacerbated the prejudice to the plaintiff.

### B.

■ In a similar vein, the record abounds with gratuitous testimony and argument about Casella's use of cocaine. There was no evidence that Casella was under the influence of any illegal drug when he was arrested; in fact, there was positive evidence—the drug test performed at the hospital—that he was not. In any event, so far as this court is aware, there is no special Fourth Amendment exception permitting the head-knocking and dog-mauling of past drug users.

The appellees assert that Casella's use of cocaine was relevant to his damages, because it tended to impeach the testimony of a physician who testified about Casella's cognitive and behavioral problems. According to appellees, the prior drug use was a "pre-existing possible cause" of the behavioral problems.

This limited purpose appears to have been invented for appeal. In closing argument, counsel for Wing urged the jury to disregard the negative drug test and find that Casella was in some sort of "craze" from a desire to obtain crack cocaine. So far as we can tell, the only evidence that Casella might have had a fiendish need for cocaine, which led him to crazily resist dog bites and slapjack blows, is the amateur psychological opinion of Wing's lawyer.

On retrial, if evidence is offered for a limited purpose, argument should honor the circumscription.

### IV.

■ Kopf next complains that she was not permitted to offer evidence of relevant prior acts of the officers.

Fed.R.Evid. 404(b) permits introduction of prior acts to show intent, lack of mistake, plan, knowledge, etc. This court has not read Rule 404(b) grudgingly. We have defined it as an "inclusionary rule," which permits the introduction of all relevant acts except those that prove *only* character. *Morgan v. Foretich,* 846 F.2d 941, 944 (4th Cir. 1988).

Kopf tried to prove Wing's intent through a 1982 incident in which a burglar at a school building had stabbed Wing's dog "Rebel" to death. Wing shot and killed the suspect. He carried Rebel from the building in tears, and gave the dog a full funeral. Wing was quoted in the newspaper as saying that any time thereafter that a dog entered a building,

---

**7.** At the end of his closing argument, Wing's counsel actually urged the jury to forego the excessive force question and, in light of Casella's guilt, to just "do the right thing":

> Now, I suggest to you there is no reason at all for you to enter a judgment for money against Joseph Wing, and obviously that is significant to him, but I suggest this case has nothing to do with Anthony Casella's civil rights. There is no civil right to do an armed robbery and to get away with it. There is no

reason at all that you should enter a judgment in the records of this court that Joe, or for that matter the other officers, violated Anthony Casella's civil rights. I know each of you want to do the right thing, and I would suggest to you that the right thing in this case as to Joseph Wing is for you to enter a verdict in favor of the defendant, that is Joseph Wing, absolute verdict in his favor.

We should not need to say that this argument was highly improper.

the incident would not be forgotten. An Officer Bancroft was also prepared to testify that it was common knowledge in the department that Wing did not like anyone to touch his dog because of his loss of Rebel.

We think that the district court should have admitted this evidence. Obloy testified that Wing had angrily shouted "don't touch my dog" just before he struck Casella in the head. The paramedic testified that Wing called the stretcher-borne Casella a "son of a bitch" because he "kicked my dog." The further corroboration provided by the prior act might have convinced the jury that Wing struck Casella with the intent to punish him for kicking Iron, and that the location of the blow—the head—was no mistake. Both intent and lack of mistake are proper purposes for admission of prior acts under Rule 404(b).[8]

## V.

Without deciding which, if any, of the errors we have recounted above might, standing alone, warrant reversal, we easily conclude that those errors collectively affected Kopf's substantial rights. *See* Fed.R.Civ.P. 61. Consequently, we must reverse and remand for a new trial.

The remaining issues can be dealt with briefly.

### A.

██ Governmental entities are not liable under § 1983 by mere *respondeat superior*. A plaintiff must prove both a constitutional violation and a custom or policy of the governmental body that caused the violation. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Kopf v. Wing,* we described this liability as derivative of, but narrower than, the individual officers'. 942 F.2d at 269. Relying in part on this language, the district court granted summary judgment for the county on the theory that the jury's verdict in favor of the officers removed a necessary element—the constitutional violation—and the county cannot be liable. Inasmuch as we are today reversing the judgment for the officers, the premise of the district court's ruling has disappeared, and we must reverse the judgment for the county as well.

### B.

After the trial, Kopf requested leave to interview jurors about the case. The only purpose stated was "to assess the utility of an appeal in this matter." The district court denied the motion, and Kopf assigns the denial as error.

Notwithstanding the lack of insights from the jurors, Kopf did in fact appeal, and her appeal has proved to have "utility" from her standpoint. The denial of her motion for leave to interview jurors is therefore moot.

### C.

Finally, Kopf has requested that we reassign this case to a different district judge. We decline to do so. Our denial of her request is not intended to preclude Kopf from asking the district court to consider stepping aside under the test we adopted in *United States v. Guglielmi,* 929 F.2d 1001, 1007–1008 (4th Cir.1991).

The judgments are reversed, and the case is remanded for a new trial.

*REVERSED AND REMANDED FOR A NEW TRIAL.*

---

8. Kopf also proffered an incident in which Kerpelman had struck a suspect in the nose with his slapjack. According to Kopf, this incident shows that Kerpelman did not make a mistake when he hit Casella on the head. The proffer of this incident is not well detailed, and we cannot tell from the record whether the situation was similar enough that it would have proved anything permissible by Rule 404(b). Hence, we express no opinion about its admissibility.