**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GLENN EARL DAVIS,
Plaintiff-Appellee,

v.

No. 96-1238

SIX SIXTEEN, INCORPORATED, t/a Club
Rogues; SAMUEL CHARLES HAMPTON,
Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry C. Morgan, Jr., District Judge.
(CA-95-441)

Argued: June 3, 1997

Decided: September 12, 1997

Before WIDENER and WILLIAMS, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Edward L. Breeden, III, BREEDEN, MACMILLAN &
GREEN, P.L.C., Norfolk, Virginia, for Appellants. David Marshall
Zobel, HUFF, POOLE & MAHONEY, P.C., Virginia Beach, Vir-
ginia, for Appellee. **ON BRIEF:** Dawn M. Peters, BREEDEN, MAC-
MILLAN & GREEN, P.L.C., Norfolk, Virginia, for Appellants.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Glenn Davis ("Davis"), a one-time professional baseball player, brought this personal injury diversity action against Six Sixteen, Incorporated ("Six Sixteen") and Samuel Charles Hampton ("Hampton") to recover compensatory and punitive damages for injuries sustained when Hampton, a bouncer at a nightclub owned by Six Sixteen, punched Davis in the face three times, breaking his jaw in two places. A jury returned a verdict in favor of Davis against both defendants, awarding Davis substantial compensatory and punitive damages.

Six Sixteen and Hampton (hereafter collectively, for simplicity, "Hampton") now appeal, contending that certain expert testimony was improperly admitted; that the district judge erred in refusing to give two of their requested jury instructions; and that the judge improperly questioned an expert witness. We find no prejudicial error and affirm.

I.

At the time in issue Davis was a professional baseball player in the Baltimore Orioles chain on assignment to the Rochester Redwings, a minor league affiliate of the Orioles. On June 7, 1993, Davis and two of his teammates, Mark Parent and Randy Ready, went to Club Rogues, a Virginia Beach nightclub owned by Six Sixteen.

The parties' testimonial accounts of what then transpired at the Club Rogues differ markedly. Indisputably, the trouble that led to Davis's injury all began when Hampton and fellow bouncers were summoned to deal with some roistering conduct by the ballplayers outside the club just after they had left the building. Critically, defendants do not contest the sufficiency of the evidence of what then happened--when assessed under the appropriate standard--to support

2

the jury's verdict. We therefore simply summarize the flatly conflicting testimonial versions of what happened.

Davis's version was that Hampton attacked him while he, Davis, was simply trying to break up an escalating exchange between Ready and several other Club Rogues bouncers; that he had no intention of fighting Hampton or any of the bouncers; and that he never made any threatening moves or gestures toward Hampton. By his account, with some supporting testimony by other eye-witnesses, Hampton initiated the physical encounter with Davis, grabbing him as he attempted to break up the altercation involving Ready. Critically, Davis's account had it that as they struggled, Hampton lured him into thinking the encounter was over by suddenly loosening his hold and looking away as if to abandon the fray, only to then fell Davis with a "sucker punch" to the jaw when Davis, with his guard down, looked away to see how Ready was faring. With Davis on the ground from the force of the sucker punch, Hampton then punched him in the face two more times. It is undisputed that the blows struck by Hampton broke Davis's jaw in two places, requiring it to be wired shut for four weeks. The evidence showed that Hampton was a professional heavyweight boxer along with his other occupations as a bouncer and construction worker.

Hampton's version was that Davis's involvement in the affray was not as a would-be peacemaker, but as an aggressor who attacked Hampton while he, Hampton, was trying to pull Davis away from Ready and another bouncer. According to Hampton, the blows he concededly struck were struck only in necessary self-defense.

Seventeen other eye-witnesses testified about different aspects of the altercation. Some witnesses testified in support of Davis's account, others supported that of Hampton. Following a six-day trial, the jury simply accepted the Davis version and rejected Hampton's, returning its substantial verdicts for Davis after around six hours of deliberation.

On the issue of damages, the parties presented conflicting expert witness testimony regarding income lost by Davis as a result of his injuries. Davis's expert at trial was Talbot Smith, President of the Houston Astros, who has 38 years of experience with professional

baseball. Smith testified that, in his opinion, Davis's lost playing time in 1993, as a result of his injury, prevented him from signing a major league contract for the 1994 season, and that such a contract would have been worth approximately $1.8 million for the entire season. This figure was then adjusted to $1,288,000 in light of the player's strike which commenced in August 1994.

As their expert damages witness, appellants presented Richard Wagner, former general manager of the Cincinnati Reds and the Houston Astros. Wagner testified that, in his opinion, Davis's "declining performance" during the period 1990 to 1993, rather than his jaw injury, was the reason Davis failed to receive a major league contract for 1994. Again, the jury simply favored Davis's version of lost income over that of appellants, returning verdicts for $1,517,434.86 compensatory, and $100,000 punitive damages.

This appeal followed.

II.

We first consider appellants' contention that the district court erred in declining to give two proffered jury instructions on the liability issue.

A.

At trial, Hampton's (hence his employer's) principal defense was self-defense, based upon his evidence that in his encounter with Davis, Davis, not he, was the physical aggressor. Hampton tendered as a proposed instruction a Virginia Model Instruction defining the right of self-defense against a battery. Such an instruction, drawing on controlling Virginia law, makes the point that where one is sustaining an actual battery at the hands of another--as opposed to sustaining an assault without battery--the person subjected to the battery may stand his ground and resist, using such force as is reasonably necessary to repel the assailant. See Crosswhite v. Barnes , 124 S.E. 242 (Va. 1924).

The district court gave self-defense instructions, as certainly was Hampton's due on the evidence, but declined to give the specific one

4

tendered by Hampton. Instead, the court charged, in two instructions, as follows:

Instruction No. 10

The law protects the physical integrity of every person from all unnecessary and unwarranted violation or interference.

Any intentional attempt or threat to inflict injury upon the person of another, when coupled with an apparent present ability to do so, and intentional display of force such as would give a person reason to fear or expect immediate bodily harm, constitutes an "assault." An "assault" may be committed without actually touching or striking, or doing bodily harm to the person of another. However, words alone are never an assault.

Any intentional use of force upon the person of another is a "battery." So, a touching, however slight, of the person of another, in a rude, insulting, or angry way, constitutes a "battery."

Instruction No. 11

Sam Hampton alleges that any act or conduct on his part which may have caused any injury or damage to the plaintiff was committed or done following an unprovoked assault by the plaintiff upon him. That is to say, the defendant, Sam Hampton, claims he acted within his lawful right of self-defense.

A person upon whom an unprovoked assault or battery is being made, or who has reasonable ground for believing, and does believe, that another person is about to inflict bodily injury upon him, need not retreat, but may stand his ground and defend the integrity of his person; and where in such self-defense of his person he injures his assailant, the law holds there is legal justification, provided he used no

5

more or no greater force or means than he in fact believed to be reasonably necessary, and would appear to a reasonable person, under like circumstances, to be necessary, in order to prevent bodily injury to himself.

Hampton's challenge is specifically directed at a selected portion of Instruction 11, i.e.:

A person upon whom an unprovoked assault or battery is being made, or who had reasonable grounds for believing, and does believe, that another person is about to inflict bodily injury upon him, need not retreat, but may stand his ground . . . .

The specific contention made by Hampton is that this instruction, by importing the situation of an assault without battery, also imported the requirement that the right of self-defense in that situation requires a belief that the assaulter is "about to inflict bodily injury." So instructed, the argument goes, the jury would have believed that Hampton's defense could exonerate him only if he was both being subjected to a battery and believed that he was threatened with bodily injury.

That argument, focussing on one narrow portion of two inter-related instructions, does not persuade us of any error, certainly none having prejudicial effect. In reviewing jury instructions, we look to the whole context in which challenged portions occur and ask only whether, so viewed, the instructions as a whole fairly instructed the jury on the relevant legal principles in light of the evidence before the jury. See Nelson v. Green Ford, Inc., 788 F.2d 205, 209 (4th Cir. 1986). Here, there was evidence from which the jury could have found preliminarily either that Davis had actually inflicted a battery on Hampton or might at least have appeared to Hampton to be threatening him with a battery--to be committing an assault--when Hampton punched him. In either circumstance, Hampton might be entitled to defend himself, so the district court quite properly, in Instruction 10, instructed the jury that they might find either an assault or a battery--and then accurately defined those different torts. Instruction 11 then followed up with a definition of the differing rights of self-defense that pertain respectively to assault and to battery situa-

6

tions. If one is being merely assaulted, he may not react with reasonable force unless he has reason to believe, and does believe, that it is necessary to avoid the threatened injury; once he is being subjected to an actual battery, he may then use such reasonable force as is necessary to repel the already-realized threat of bodily injury. That was the clear gist of the two instructions in combination. That the proposition might have been somewhat more clearly stated does not require appellate correction where the gist is sufficiently clear. See Hardin v. Ski Venture, Inc., 50 F.3d 1291, 1295 (4th Cir. 1995). Nor does the refusal of the court to instruct precisely as may have been requested. Id. at 1294.

We find no prejudicial error in the district court's self-defense instruction.

B.

Hampton also challenges the district court's refusal to give any instruction--as Hampton requested--on the right of a landowner to use force when removing a trespasser from his property. Pointing to evidence that Hampton only used force against Davis after Davis and his friends had been ordered off the premises, Hampton says this invoked the landowner-trespasser defense.

The district court refused to give any instruction on this defense on the basis that the evidence would not support the necessary finding that at the critical time Davis was in fact a trespasser. We need not decide whether the court was correct in that perception for even if we were to conclude that a trespass might have been found, any error in declining to instruct on this defense was harmless. A proper instruction on this defense would have told the jury only that a landowner has a right "`to order [a trespasser] away, and if he refuse[s] to go, to use proper force to expel him' so long as no breach of the peace is committed in the outset." Diffendal v. Commonwealth, 382 S.E.2d 24, 25-26 (Va. App. 1989) (quoting Montgomery v. Commonwealth, 37 S.E. 841, 842 (Va. 1901)).**1**

_____

**1** The requested instruction probably would have given greater latitude in the use of force than would the Diffendal statement of rule; it would have allowed any force that would not cause serious bodily injury--presumably without regard to the circumstances.

All such an instruction would have given Hampton was the chance to escape liability by proving that the force he used on Davis was "proper" under the circumstances. The jury, however, necessarily had rejected, in rejecting his self-defense defense--any finding that the force he used was "reasonable" under the circumstances. It cannot be assumed that a jury unwilling to find reasonable force in the act of breaking a jaw with a "sucker punch" as a matter of self-defense nevertheless would be prepared to find the same use of force "proper" for purposes of evicting a trespasser.

For these reasons, if there was any error in declining to give a specific landlord-trespasser instruction--of which we are doubtful--it was harmless.

III.

On the damages issue, appellants contend that the trial court erred by permitting Davis's expert witness, Talbot Smith, to testify as an expert and offer his opinion that Davis would likely have received a $1,800,000 contract to play major league baseball had he not suffered the broken jaw in 1993. "Whether to allow expert testimony and whether a potential witness possesses sufficient education and training to render an expert opinion are questions committed to the discretion of the trial judge," and in review, we consider only whether such discretion has been abused. Sparks v. Gilley Trucking Co. Inc., 992 F.2d 50, 53 (4th Cir. 1993) (citation omitted).

Davis claimed physical, emotional and economic damages as a result of his injury. Specifically, as to economic damage he argued that because his broken jaw prevented him from playing most of the 1993 baseball season, this lack of playing time precluded him from landing a major-league contract for the 1994 season. As a result, he lost substantial income. Smith, testifying as a qualified expert, opined that people involved in baseball, such as managers, scouts or team owners, need to see players perform for a substantial length of time--preferably an entire season--in order to evaluate their talent. Davis's jaw injury precluded him from playing a full season in 1993 and prevented him from obtaining the type of exposure necessary to acquire a contract for 1994.

8

Viewed as a whole, Smith's testimony focused on two issues central to Davis's claim for damages: (1) whether there was a causal connection between Davis's lost playing time during the 1993 baseball season and his failure to obtain a major league contract for 1994; and (2) if so, whether such monetary loss could be quantified. Appellants admitted during trial that Smith was knowledgeable about baseball. Indeed, in their brief, they concede that Smith has had an extensive career in professional baseball since 1958, a career which has exposed him to the recruitment and evaluation of talent, scouting, the training of players, team assembly, contract negotiation, player arbitration, and the overall evaluation of baseball teams.

Despite Smith's qualifications, appellants claim that under the standards enunciated in Daubert v. Merrell-Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and according to Rule 702 of the Federal Rules of Evidence, Smith's speculative opinion concerning Davis's ability to secure a major league contract in 1994, and the salary to which Davis would therefore have been entitled, should have been excluded. With respect to the contention that Smith's testimony should have been excluded under Daubert, we find the argument to be without merit. Simply put, we do not believe that the evidence proffered by Smith concerning baseball salaries and the likelihood Davis would have secured a contract had he not been injured in 1993, is the type of "scientific" evidence that must pass Daubert muster.

And, we believe that the evidence clearly was admissible under Evidence Rule 702, which provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Whether expert testimony will assist the jury is dependent on the facts of the particular case. Kopf v. Skyrm, 993 F.2d 374, 379 (4th Cir. 1993). In this case, the testimony offered by Smith surely could assist the jury in quantifying the economic loss, if any, that Davis had suffered as a result of his jaw injury. It was therefore clearly admissible for that critical purpose.

9

IV.

We have considered appellants' remaining assignments of error[2] and find them to be without merit.

<u>AFFIRMED</u>

_____

[2] These were that: (1) the district court erred by improperly questioning their expert witness; and (2) the court erred in permitting Davis to impeach Hampton using deposition testimony concerning whether Hampton had ever been charged with a crime.

10