UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROBERT CLEM,

      *Plaintiff-Appellant,*

    v.

S. CORBEAU,

      *Defendant-Appellee,*

      and

COUNTY OF FAIRFAX, VIRGINIA; J. THOMAS MANGER, individually and as Chief of Police of Fairfax County; E. NELSON, individually and as Police Officer of Fairfax County, VA,

      *Defendants.*

No. 03-1831

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonard D. Wexler, Senior District Judge.
(CA-00-1684-A)

Argued: February 25, 2004

Decided: April 29, 2004

Before MOTZ, KING, and GREGORY, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Brien Anthony Roche, JOHNSON & ROCHE, McLean, Virginia, for Appellant. Cynthia Lee Tianti, Assistant County Attor-

ney, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF FAIRFAX, Fairfax, Virginia, for Appellee. **ON BRIEF:** Eric David Kessel, JOHNSON & ROCHE, McLean, Virginia, for Appellant. David P. Bobzien, County Attorney, Peter D. Andreoli, Jr., Deputy County Attorney, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF FAIRFAX, Fairfax, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Robert Clem brought this excessive force suit against Shannon Corbeau, a Virginia police officer. A jury found for Corbeau and Clem appeals. Finding no reversible error, we affirm.

### I.

On November 9, 1998, Corbeau and fellow police officer Eric Nelson were dispatched to Clem's home in response to a 911 call from Clem's wife. She related that Clem had refused to eat, take his medication, or go to his medical appointments, and was urinating on himself and dropping lit cigarettes on the carpet. Officer Corbeau testified that on his way to Clem's house, another officer, who had been to the Clem home on a similar call five weeks earlier, radioed that Clem had threatened his wife with a knife on that prior occasion.

Officers Corbeau and Nelson arrived at the Clem home simultaneously and were greeted at the door by Clem's nephew, Paulos Yacob, who brought the officers into the breakfast area, where Clem was seated. Corbeau and Nelson both observed that Clem appeared to be mentally ill, looking "out of it" and "not making any sense."

The officers attempted to persuade Clem to go see his doctor. At first, Clem seemed open to the suggestion, but suddenly his mood

changed and he became "agitated." Yacob testified that Clem patted his pant leg and said, "[m]other-fucker, son of a bitch, you think I'm afraid of you because of your badge." Corbeau and Nelson reported that Clem said something to the effect of, "I have something better than what you have on your belt," and patted his pants leg. Clem then stood up and began "charging" Corbeau. According to Corbeau, Clem threatened to kill him, as he was charging. After Clem ignored Corbeau's warnings to "get back," Corbeau sprayed Clem with pepper spray.

Although the pepper spray stopped Clem's approach, it also adversely affected the others present in the room. Mrs. Clem and Yacob went to the bathroom to wash the pepper spray out of Mrs. Clem's eyes. Nelson stepped outside to spit the taste of mace out of his mouth and radioed for a rescue squad and a supervisor. Corbeau pulled out his expanded baton and attempted to move forward to control Clem, but stepped into a residual cloud of pepper spray that incapacitated him for 20 to 30 seconds.

Upon reentering the house, Nelson testified that "Clem was coming after" him in the living room, uttering profanities and racial epithets and swinging both hands. After ordering him to back up, Nelson sprayed Clem with pepper spray. The mace "took no effect" and Clem continued his approach. Clem "took a swing" at Nelson, which Nelson was able to brush away.

At this point, Clem turned to Corbeau, who was now standing at the entrance to the hallway with his baton extended. Clem then rushed Corbeau, reportedly with the same "intensity of rage and anger." According to Corbeau, Clem was again uttering a threat to kill. Corbeau began backing down the hallway, warning Clem to stay back. It was at this time that Corbeau unholstered his gun and shot Clem three times in quick succession. Corbeau reported that he felt he had to shoot Clem because the mace had failed to stop Clem; the officer was in a confined space (the hallway) that would not allow him to use his baton effectively; and Clem's threats, conduct, larger size (Clem was taller and at least 50 pounds heavier), and demeanor caused Corbeau to fear for his life.

Clem filed suit in state court against Corbeau and Nelson, alleging, *inter alia*, an excessive force claim under 42 U.S.C. § 1983 (2000),

and a state law assault and battery claim. Corbeau and Nelson removed the case to federal court. Judge T. S. Ellis granted summary judgment to Corbeau and Nelson on Clem's claim that they used unconstitutionally excessive force when they subjected him to pepper spray and to Fairfax County and its police chief on Clem's training and supervision claim. However, Judge Ellis denied both Clem and Corbeau summary judgment on the excessive force and assault and battery claims arising from Corbeau's shooting of Clem. We affirmed the denial of summary judgment on the excessive force claim and dismissed Corbeau's interlocutory appeal of the denial of summary judgment on the assault and battery claim. *Clem v. Corbeau*, 284 F.3d 543 (4th Cir. 2002). The claims on which Judge Ellis had refused to grant summary judgment, growing out of Corbeau's shooting of Clem, were then tried before a jury, with Judge Leonard Wexler presiding; the jury returned a verdict for Corbeau. This appeal followed.

## II.

Clem first argues that the district court erred in excluding certain evidence. We review a district court's evidentiary rulings for abuse of discretion. *United States v. Russell*, 971 F.2d 1098, 1104 (4th Cir. 1992).

The district court precluded the testimony of Clem's two use of force experts, Lou Reiter and Dwight Colley. Whether an officer has used excessive force is judged by a standard of objective reasonableness, which requires a jury to determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).[1]

---

[1]An officer's use of *deadly* force is justified only when a reasonable officer would have "sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott*, 99 F.3d at 642. The Supreme Court has also stated that this threat should be "immediate." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). The district court instructed the jury both that Corbeau's use of deadly force was "not justified unless there was probable cause to believe that there was a threat of serious harm to the defendant or others," and that the jury could take into

As a general proposition, an "objective reasonableness" standard may be comprehensible to a lay juror and require no expert assistance. *Kopf v. Skyrm*, 993 F.2d 374, 378 (4th Cir. 1993). However, in an excessive force case, the relevant standard of conduct used to assess reasonableness "is not defined by the generic — a reasonable *person* — but rather by the specific — a reasonable *officer.*" *Id.* As a result, the reasonableness inquiry in an excessive force case can involve "specialized knowledge," which an expert witness can assist the jury in understanding. *Id.*; *see also* Fed. R. Evid. 702. Indeed, in *Kopf*, we held that a district court had abused its discretion in excluding expert testimony "as to the prevailing standard of conduct for the use" of two "specialized tool[s]" of police work: police dogs (the training and use of which were held to be "obscure skills") and slapjacks. *Id.* at 379. Clem argues that the district court similarly abused its discretion by excluding the expert testimony of Reiter and Colley on the use of force because "the standard by which Corbeau was to be judged is beyond the scope of the average lay person."

However, *Kopf* did not establish a "blanket rule that expert testimony is generally admissible in excessive force cases." *Kopf*, 993 F.2d at 378. Rather, we there specifically noted that "the facts of every case will determine whether expert testimony would assist the jury." *Id.* at 379. Here the proffered experts did not offer expert testimony providing specialized knowledge on "obscure skills." Their only relevant testimony involved opinions, given their particular interpretations of the contested facts, as to the reasonableness of Corbeau's use of force at issue in this case (i.e. his shooting of Clem).[2]

account whether this threat was "immediate." These instructions adequately informed "the jury of the controlling legal principles without misleading or confusing the jury to the prejudice" of Clem. *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 191 (4th Cir. 2003). Contrary to Clem's contentions, the court did not abuse its discretion in refusing to grant his request to mention the serious harm and immediacy factors in the same sentence or phrase.

[2]As for those parts of Reiter's Expert Witness Designation and Colley's report and deposition testimony evaluating the reasonableness of Corbeau and Nelson's actions *preceding* the shooting (e.g. their interactions with Clem in the breakfast area), these evaluations are not relevant to the case at hand. Corbeau's shooting of Clem was the only use of force at issue here, and "*Graham* requires us to focus on the moment force was used; conduct prior to that moment is not relevant in determining whether an officer used reasonable force." *Elliott*, 99 F.3d at 643.

Instead of assisting the jury, such expert opinion risked "supplant[ing] a jury's independent exercise of common sense" and its role of determining the facts. *Id.* at 377. Thus, the district court did not abuse its discretion in excluding this testimony.

Clem also contends that the district court abused its discretion in excluding testimony and exhibits relating to Corbeau's training. However, to the degree that information regarding Corbeau's training was, as Clem argues, "probative of what is reasonable in this case," (and hence not a collateral issue) the court could have reasonably expected Clem at least to attempt to elicit such information from Corbeau himself. Extrinsic testimony or exhibits regarding Corbeau's training would become necessary only if Corbeau showed himself to be uncooperative or misleading when questioned by Clem. *Cf. id.* at 377 (finding reversible error when Kopf was forced to call one of the defendant-officers as an adverse witness on the standards for use of a police dog and was unable to rebut the officer when he did not give Kopf the answers "Kopf would have liked"). It might have been error had the court not allowed Clem to impeach Corbeau's testimony if such impeachment became necessary; until such time, however, the district court acted within its discretion in excluding evidence whose "probative value is substantially outweighed by . . . considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

When Clem did broach the subject of Corbeau's training, the district court stated, over Officer Corbeau's objection, that it would allow all such questions regarding what Corbeau "knew and what experience he had," and admitted an exhibit that, according to Clem, "set forth the regimen of training that [Corbeau] received in the Fairfax Police Academy." Further, Corbeau himself showed no tendency to be uncooperative or misleading, and Clem cites no responses of Corbeau's that he would have wanted to impeach. In response to the few questions that Clem did ask Corbeau regarding his training in self-defense tactics, for instance, Corbeau agreed that he had received training in hand-to-hand combat when he was in the Marines, and that about one quarter of his training at the police department had been devoted to such tactics. Indeed, the amount of information Clem obtained from Corbeau about his training appeared to be limited only by Clem's own decision about what questions to ask the officer.

Accordingly, the district court did not abuse its discretion in its evidentiary rulings.

### III.

Clem next argues that certain comments of the district court prevented him from receiving a fair and impartial trial. Because "[i]t was the jury, not the trial judge, that found" for Corbeau, "to argue that he was deprived of a fair trial," Clem must show that the judge's comments "somehow affected the outlook or deliberations of the jurors." *Rowsey v. Lee*, 327 F.3d 335, 342 (4th Cir. 2003). Although Clem did not object at trial to the court's comments, "where a trial judge's comments were so prejudicial as to deny a party an opportunity for a fair and impartial trial, the absence of objections will not preclude our review since counsel will be loathe to challenge the propriety of a trial judge's utterances for fear of antagonizing him and thereby prejudicing a client's case." *Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 839 (4th Cir. 1987). However, the Supreme Court has ruled that "expressions of impatience, dissatisfaction, annoyance, and even anger" — an accurate description of all of the comments to which Clem now objects — do "[n]ot establish[ ] bias or partiality" on the part of a judge. *Liteky v. United States*, 510 U.S. 540, 555-56 (1994).

The district court's numerous comments expressing impatience, dissatisfaction, and annoyance with Clem's counsel in front of the jury substantially departed from the "general model of judiciousness." *United States v. Head*, 697 F.2d 1200, 1210 (4th Cir. 1982). Nevertheless, we cannot conclude that these comments denied Clem a fair and impartial trial. Unlike those cases in which we have found such a level of prejudice, *see*, *e.g.*, *Sit-Set, A.G. v. Universal Jet Exch., Inc.*, 747 F.2d 921, 926 (4th Cir. 1984), the comments in this case did not "tend[ ] to impose upon the jury what the judge seems to think about the evidence," *United States v. Cole*, 491 F.2d 1276, 1278 (4th Cir. 1974), nor did they constitute direct attacks on the plaintiff or plaintiff counsel's "credibility or the strength of [his] case," *United States v. Simpkins*, 505 F.2d 562, 565 (4th Cir. 1974). Rather, all of the comments involved admonishments of Clem's counsel "as to the improper form," repetitiveness, or relevance of his questioning. *Id.* Clem cites no case in which we have found such admonishments — even when delivered in an "inflammatory and insulting" manner,

*United States v. Gastiaburo*, 16 F.3d 582, 590 (4th Cir. 1994) — to establish trial bias or partiality. *Cf. id.*; *Stillman*, 811 F.2d at 839; *Head*, 697 F.2d at 1210; *Simpkins*, 505 F.2d at 565.

Moreover, the judge's lengthy instructions, both at the beginning and end of the trial, that "[n]othing the Court may say or do during the course of the trial is intended to indicate nor should be taken by you as an indication of what your verdict should be" cured any prejudice that might have arisen from these comments. *See, e.g.*, *United States v. Villarini*, 238 F.3d 530, 537 (4th Cir. 2001).

IV.

Clem also raises arguments in connection with his state law assault and battery claim.

First, he contends that he was entitled to judgment as a matter of law on this claim because Corbeau allegedly never raised any affirmative defenses to it in his answer or any pre-trial motion — and "the general rule [is] that a party's failure to raise an affirmative defense in the appropriate pleading results in waiver." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999). Absent any excuse or justification, Clem argues that Corbeau's intentional shooting was "clearly an assault and battery."

Even if Corbeau did have to assert reasonable force as an affirmative defense, *but see*, *Edson v. City of Annaheim*, 74 Cal. Rptr. 2d 614, 615-16 (Cal. Ct. App. 1998) (collecting cases holding that a plaintiff asserting a battery action against a police officer must prove unreasonable force as an element of the tort), he *did* advance in his answer the defense that the "force used against [Clem] . . . was reasonable and necessary" and "any injury was a result of [Clem's] own actions." Although Corbeau did not explicitly state the term "self-defense" — the applicable affirmative defense to assault and battery, *see Hughes v. Commonwealth*, 573 S.E.2d 324, 331 (Va. Ct. App. 2002) — his answer sufficiently encapsulated the elements of self-defense under Virginia law to have put Clem on notice that Corbeau intended to rely on this defense. *See Diffendal v. Commonwealth*, 382 S.E.2d 24, 26 (Va. Ct. App. 1989).

This was all that was necessary. "An affirmative defense may be pleaded in general terms and will be held to be sufficient . . . as long as it gives plaintiff fair notice of the nature of the defense." 5 Charles Allan Wright & Arthur R. Miller, Federal Practice & Procedure § 1274, at 455-56 (2d ed. 1990); *see also* Fed. R. Civ. P. 8(e), (f) (providing that "[n]o technical forms of pleading or motions are required" and "[a]ll pleadings shall be so construed as to do substantial justice"); *Peterson v. Airline Pilots Ass'n*, 759 F.2d 1161, 1164 (4th Cir. 1985) (stating that an affirmative defense not asserted in an answer or motion is not automatically waived, but requires a "showing of prejudice or unfair surprise").

Additionally, Clem asserts that the district court erred in not instructing the jury on his assault and battery claim. The court refused to do so, explaining to Clem that "if you win on excessive force, you get everything you want that's included" in the assault and battery charge, but "if you lose on excessive force, you lose on everything."

Though separate instructions for Clem's federal and state law claims might have been preferable, we find no reversible error given that, under the facts of this case, a jury finding against Clem on the excessive force claim but for Clem on the assault and battery claim would have been "inconsistent." *Carter v. Rogers*, 805 F.2d 1153, 1158 (4th Cir. 1986). An officer's liability for the use of excessive force under § 1983 is not completely "co-extensive with the common law tort liability for battery," *Freeman v. Freeman*, 695 F.2d 485, 492 (7th Cir. 1982), but we do "not perceive on the facts of this case how the factfinder could find for [Clem] on one cause of action and not on the other." *Carter*, 805 F.2d at 1158.[3] "[U]nreasonable or unneces-

---

[3]One arguable distinction between an excessive force claim and an assault and battery claim justified by self defense is that Virginia self-defense law would require Corbeau to "retreat[ ] as far as he safely can before he attempts to repel the attack" if he was found to be "at fault in precipitating" the assault. *Foote v. Com.*, 396 S.E.2d 851, 855 (Va. Ct. App. 1990). However, as Clem himself admits, in granting summary judgment to Corbeau on the mace claim, Judge Ellis held (in a ruling that Clem never appealed) that "Corbeau's use of pepper spray in the circumstances was reasonable." Given this holding, Corbeau cannot be said to have been at fault for precipitating the assault.

sary force was the touchstone of both causes of action" and we do not see any significant "distinction between the degree of unnecessary and unreasonable force" required for a jury to find for Clem on either claim. *Id*. Conversely, a finding for Corbeau under either cause of action required the jury to find that Corbeau had "sound reason to believe that [Clem] pose[d] a threat of serious physical harm" to the officer. *Elliott*, 99 F.3d at 642; *see also McGhee v. Com.*, 248 S.E.2d 808, 810 (Va. 1978) (noting that a defendant asserting self-defense to justify the use of deadly force "must reasonably fear death or serious bodily harm to himself at the hands of his victim"). In sum, the failure of the court to provide separate instructions on the assault and battery and excessive force claims in this case cannot be said to have prejudiced Clem.

V.

Clem's final objections arise from limitations on his examination of Officer Nelson, whom Clem called as a witness.

On cross-examination by Corbeau's counsel, Nelson stated for the first time that Clem had told Corbeau in the kitchen breakfast area, "I have something better than what you have on your belt." On redirect, Clem's counsel attempted to impeach this testimony by reference to Officer Nelson's prior recorded statement of November 18, 1998, in which Nelson indicated only that Clem had said "I am not *afraid of what you've got* on your belt" (emphasis added). However, the district court sustained Corbeau's objection to this line of inquiry, apparently on the ground that Clem had already discussed Nelson's statement on direct examination. In fact, Clem had not discussed this specific statement, and Clem therefore argues that the court's refusal to allow him to impeach Nelson's cross-examination statement constituted an abuse of discretion.

---

Clem also argues that the "reasonable man" standard would apply to the self-defense claim while the "reasonable police officer standard" applies to excessive force cases. However, a reasonable person standard would require *less* of a defendant than a reasonable police officer standard and hence would have made a jury *less* likely to find for Clem on the assault and battery claim.

Generally, a district court will properly "allow testimony on redirect which clarifies an issue which the defense opened up on cross-examination even when this evidence is otherwise inadmissible." *United States v. Catano*, 65 F.3d 219, 226 (1st Cir. 1995). Nelson's cross-examination belt statement certainly "opened the door for [Clem] to impeach that testimony." *United States v. Kroh*, 915 F.2d 326, 332 (8th Cir. 1990). Moreover, Nelson's prior statement in its entirety had already been admitted into evidence and had already "been mentioned in another context, was clearly probative of the credibility of [Nelson's cross-examination] testimony, and was not unfairly prejudicial." *Id.* Hence, we find that the district court did abuse its discretion in not permitting the impeachment of Nelson with his prior statement.

However, given that Nelson's entire prior statement was admitted into evidence and before the jury; that Nelson confirmed that he had given this prior statement; and that Clem elicited at least some testimony regarding the prior Nelson statement from Lieutenant Vice (the officer to whom the statement was made), we cannot conclude that the court's refusal to allow Clem to impeach Nelson with that statement "substantially swayed" the verdict. *Taylor v. Va. Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999). Thus, the error was harmless.

Clem further argues that the district court abused its discretion in imposing a forty-five minute time limit on his direct examination of Nelson, given that Clem stated that he needed two hours. Trial courts have the discretion to "'exercise reasonable control over' the interrogation of witnesses and the presentation of evidence in order to . . . avoid needless waste of time in the presentation of a case." *United States v. Castner*, 50 F.3d 1267, 1272 (4th Cir. 1995) (quoting Fed. R. Evid. 611(a)). In this case, Clem has proffered no probative evidence effectively excluded by the court's time limit. Further, the district court did not impose the kind of "rigid hour limits" that some courts have discouraged. *See, e.g.*, *Johnson v. Arby*, 808 F.2d 676, 678 (8th Cir. 1987). Rather, the court appeared flexible in allowing Clem additional time to present evidence, giving him an hour (instead of the allotted 45 minutes) on the first day and additional time upon Clem's request the following day. Accordingly, the district court did not abuse its discretion in imposing the challenged time limitations.

## VI.

For the foregoing reasons, the judgment of the district court is in all respects

*AFFIRMED.*