**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                No. 95-5919

NORWOOD MCMAHON, a/k/a Woody,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                No. 95-5920

JOHN W. MCMAHON,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                                 No. 95-5921

ASSOCIATED HEALTH SERVICES, d/b/a
The Health Development Center,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CR-95-82)

Argued: December 4, 1996

Decided: June 8, 1998

Before RUSSELL* and MICHAEL, Circuit Judges, and DAVIS,
United States District Judge for the District of Maryland,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Nina Jean Ginsberg, DIMURO, GINSBERG & LIEBER-
MAN, P.C., Alexandria, Virginia; Lisa Bondareff Kemler, MOFFITT,
ZWERLING & KEMLER, P.C., Alexandria, Virginia, for Appellants.
Robert William Wiechering, Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Vir-
ginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attor-
ney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria,
Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

At the times relevant to the events giving rise to this case, Appel-
lant Norwood McMahon ("Dr. McMahon") was authorized to practice
chiropractic medicine in Virginia. Based on direct and circumstantial
evidence of a broad-based scheme, which was executed over several
years, designed to defraud insurers and other third party payers of

_____

*Judge Russell participated in the hearing of this case at oral argument
but died prior to the time the decision was filed. The decision is filed by
a quorum of the panel. See 28 U.S.C.A. § 46(d) (West 1993).

2

health care benefit payments to which he and his clinic were not entitled, Dr. McMahon was convicted by a jury in the United States District Court for the Eastern District of Virginia of numerous offenses.[1] His co-defendant and brother, Appellant John McMahon, was convicted of a single count of structuring a financial transaction to avoid the filing of a currency transaction report in violation of 31 U.S.C. §§ 5322, 5324(3). Raising a host of issues, Appellants contend that the trial court committed errors in its rulings and determinations which singly and in combination deprived each of them of a fair trial. Finding no reversible error, we affirm.

I.

Taking the facts in the light most favorable to the government, see United States v. Burgos, 94 F.3d 849, 862-63 (4th Cir. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 1087 (1997), the prosecution presented substantial evidence at trial sufficient to permit a reasonable jury to make the following findings. As the Appellants have asserted several claims of evidentiary insufficiency, the facts and inferences reasonably arising therefrom supportive of the government's theories shall be set forth in some detail.

In late 1988, together with Dr. Brett Fuller, Dr. McMahon began Associated Health Services, Inc.[2] This corporation operated two chiropractic clinics, with Dr. McMahon operating the facility in Manassas, Virginia, under the trade name The Health Development Center. Drs. McMahon and Fuller discussed with a third chiropractor, Dr.

_____

[1] The indictment contained 51 substantive counts and a forfeiture count. Ultimately, Dr. McMahon was convicted of count 1 (conspiracy to defraud the United States, to commit mail fraud and to defraud the Internal Revenue Service), 18 U.S.C. § 371; counts 2-12 (false claims), 18 U.S.C. § 287; counts 13-32 (mail fraud), 18 U.S.C. § 1341; counts 34-39 (money laundering), 18 U.S.C. § 1956(a)(1)(B)(i); counts 40-44 (money laundering), 18 U.S.C. § 1956(a)(1)(B)(ii); and structuring a financial transaction for the purpose of evading reporting requirements, 31 U.S.C. § 5322, 5324(3). Under all counts but count one, he was charged both as a principal as well as an aider and abetter, 18 U.S.C. § 2.
[2] Associated Health Services, Inc. was also convicted of certain indictment counts, but is not a party to this appeal.

Michael Sweeney, the desirability of hiring a medical doctor to work part-time at their respective clinics. The purpose of hiring a medical doctor, inter alia, was to make it possible to bill chiropractic services under the medical doctor's name so as to circumvent limitations on insurance coverage for chiropractic care.

Specifically, Drs. McMahon and Sweeney traveled to Florida in January 1988 and met with a chiropractor who had an established practice with a medical doctor on staff. They learned during their visit that, generally, the chiropractor and medical doctor each had to bill insurers separately for their particular services. Nevertheless, Drs. McMahon and Sweeney agreed to disregard this admonition so as to maximize the amount of money they could receive from third party payers, such as insurance companies.

In late 1988, Drs. McMahon, Fuller and Sweeney hired Suigit Singh, M.D., a medical doctor, to work in their clinics. Dr. Singh spent approximately one day a week at each of the three clinics, and each of the three chiropractors contributed a third of her salary. In a typical day at Dr. McMahon's clinic, Dr. Singh would examine 10-15 patients. She would conduct an initial exam and thereafter write a prescription for chiropractic care. She did not supervise any care or treatment rendered by Dr. McMahon or any other licensed or nonlicensed (e.g., massage therapists) providers employed at the clinic. She did not review Dr. McMahon's treatment notes, and she rarely even spoke to a chiropractor about a specific patient.

Dr. Singh was not aware that chiropractic services, massage therapy, and other treatments were being billed to third party payers under her name and provider number. When she learned of the billing practices, she resigned her position at the three clinics, and directed that her signature not be placed on any correspondence from the clinics. After resigning her position, Dr. Singh requested that her signature stamps be returned from the clinics. Dr. Sweeney returned the signature stamp used at his clinic, but Dr. McMahon did not return the stamp available at his clinic, although he represented to Dr. Sweeney that he had discarded it. In fact, Dr. McMahon continued to use Dr. Singh's signature stamp and to bill under Dr. Singh's signature and provider number for several months after she resigned. Additionally, according to evidence of handwriting analysis and the testimony of a

4

patient who had never been examined by Dr. Singh, the jury could have found that Dr. McMahon actually forged prescriptions for chiropractic treatments.

Detailed evidence was presented at trial concerning the billing practices at Dr. McMahon's clinic. This evidence disclosed that prior to Dr. Singh's tenure, the clinic experienced difficulties obtaining insurance coverage for chiropractic patients as a result of limitations on the dollar amount of benefits for such services, or limitations on the number of visits allowed for such services. After Dr. Singh was hired, Dr. McMahon altered the billing procedures at the clinic. For example, a new insurance verification form was instituted, and Dr. McMahon instructed his staff to call insurance companies to obtain information concerning available coverages to new clinic patients, but to conceal the fact that they were calling on behalf of a chiropractic clinic.

Thus, whether a patient was directed to see Dr. Singh for a "prescription" for chiropractic care was largely determined by the availability of, and type of, insurance coverage enjoyed by the patient. Moreover, if a new patient appeared at the clinic on a day other than the day when Dr. Singh was present, the patient would generally receive chiropractic treatment, and the claim form for that treatment would be held until the patient could see Dr. Singh, who would issue a prescription for chiropractic care.

During the years that the scheme was in place, the clinic received numerous inquiries from insurance companies regarding the identity of the service provider in many instances. Dr. McMahon instructed his employees that insurance company representatives were to be told, falsely, that Dr. Singh had performed and/or actively supervised treatments. Dr. McMahon also instructed employees to bill spinal manipulations and other chiropractic treatments as "office visits" with Dr. Singh, in those instances where he knew that insurance companies would not accept a claim of chiropractic treatment by a medical doctor.

To place the scheme in its professional setting and to meet the anticipated defense of "good faith," the government presented testimony of several witnesses with experience and expertise in the rele-

5

vant fields. Joseph Osbourne of Blue Cross and Blue Shield of Virginia ("BCBS"), one of the benefit providers which covered some chiropractic services, testified. Osbourne outlined how medical professionals apply to BCBS to receive a provider number. When claims are submitted to BCBS, the provider number of the professional is included on the claim. The provider can then receive direct reimbursement if appropriate under the coverage of the patient. On the claim, a code would be included to designate the specific service that was rendered. Osborne testified that BCBS requires that chiropractic services be billed under a specific code and not as an "office visit," and that a professional employee of a medical doctor cannot use his or her employer's provider number; rather, each must use a personal, individual provider number. BCBS does not reimburse for chiropractic services that are billed under a medical doctor.

Osbourne explained that BCBS maintains a toll free number for inquiries on billing procedures, offers seminars to providers with questions regarding billing procedures, and regularly issues bulletins to providers on the subject. Patricia Dyer McMahon, the former office manager (and estranged wife) of Dr. McMahon, who pled guilty to filing a false claim against the government in connection with her employment at Dr. McMahon's clinic, testified that she attended such a BCBS seminar in 1989.

In connection with the government's investigation of Dr. McMahon, BCBS audited his claims for the period covered by the investigation. The audit disclosed that Dr. McMahon's clinic submitted 6,590 separate claims to BCBS, that 4,878 of these were billed under Dr. Singh's provider number, but that medical records revealed Dr. Singh actually provided services in only 87 of the instances studied. BCBS paid $145,746.49 in claims to the clinic during the relevant time period, of which $139,468.10 should not have been paid.

* * * *

Appellant John McMahon was a stockbroker, investment adviser and licensed real estate broker. He had a B. S. degree in business administration, finance and marketing, and an additional two years of relevant education and training necessary to receive the designation of Certified Financial Planner.

There was significant circumstantial evidence that John McMahon had in depth exposure and training in the various statutes, rules and regulations relevant to the financial services and investment industry, in which he was employed starting in 1989, including those relating to cash transactions and the reports mandated by law attendant to such transactions. For example, his employer, Manna Financial Services, had a Standard Operating Procedure Manual ("SOP") provision dealing with the receipt of cash. John McMahon admitted at trial that as part of his duties and responsibilities at Manna Financial, he was familiar with the SOP, including the IRS Form 8300 relating to cash transactions.[3] In addition, an incident at Manna Financial in 1992 involving a cash transaction had resulted generally in a heightened awareness at the firm of the IRS Currency Transaction Reporting ("CTR") requirements among the ten employees of Manna Financial. In addition to the Form 8300, the Manna Financial SOP contained several pages of provisions explaining the reporting requirement on cash transactions in a business. This included additional guidance that the structuring of a single transaction into separate transactions

_____

[3] While it is for reporting cash payments received in a trade or business, the Internal Revenue Service Form 8300 ("Report of Cash Payments Over $10,000 Received in a Trade or Business") also contains on the reverse additional guidance concerning cash transactions generally. Specifically, in the instructions, it explains the concept of structuring and that,

> . . . a transaction is related even though it occurs during a period of more that 24 hours if the recipient knows, or has reason to know, that each transaction is one of a series of connected transactions.

J.A. at 1654. Further, it provides notice that financial institutions are required to file CTRs (Form 4789) for these cash transactions. The "Penalties" section of the instructions admonishes:

> Civil and criminal penalties including up to 5 years of imprisonment are provided for failure (or causing the failure) to file a report, for filing (or causing the filing) of a false or fraudulent report, and for structuring a transaction.

Id.

7

involving less than $10,000 each, when they are connected in reality, can lead to reporting requirements.[4]

John McMahon was also required to review and be familiar with the periodic "Notice to Members" routinely mailed to member firms of the National Association of Securities Dealers ("NASD"). Manna Financial was a member firm of the NASD and routinely received these "Notice to Members." Copies of the notice were habitually maintained by Manna Financial for approximately one year after their receipt, and the brokers at Manna Financial, such as John McMahon, were required and expected to be familiar with the materials.

The government introduced the "Notice to Members" from February and March 1989, which were sent to Manna Financial and maintained in the normal course of business. The February 1989 "Notice to Members" is headlined "Reporting Suspicious Currency and Other Questionable Transactions to the IRS/Customs Hotline." The notice alerts members to be on the lookout for suspicious cash transactions and provides the number for a U.S. Customs hotline to report such transactions. The notice specifically included the following:

> . . . a person structures a transaction when that person, acting alone or in conjunction with or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days in any manner, to evade the currency-reporting requirements. Therefore, it is important for all members to be alert for individuals who may be attempting to launder money by intentionally structuring transactions to evade the currency-reporting requirements and to elude law enforcement authorities.

J.A. at 1662. The notice further cautioned that "[s]uch arrangements can constitute a criminal violation for evasion of the regulations' currency-reporting requirements." Id. at 1661.

_____

[4] In addition, as a member of NASD, John McMahon was required to be familiar with the requirements of the NASD Manual, which contains information in respect to currency reporting requirements.

The March 1989 "Notice to Members" is headlined "Treasury Finalizes Two Amendments Re: Currency Transaction; Reissues Current Currency Transaction Report Form." Once again, the notice advised members that evading currency reporting requirements is a criminal violation. It also contained the final Treasury definition of structuring.[5]

John McMahon was the principal financial adviser to his brother. They were in frequent contact during early 1993, and they would speak on a weekly basis about the management of Dr. McMahon's financial and investment accounts. In the course of the government's investigation, on February 25, 1993, an FBI Special Agent served on Dr. McMahon a grand jury subpoena calling for the production of extensive personal financial information. The jury reasonably could have inferred that Dr. McMahon and his brother consulted with each other in connection with Dr. McMahon's responsibility to produce records to the grand jury in response to the subpoena.

On February 24 and 26, 1993, counsel retained by Dr. McMahon conducted legal research on the issue of money laundering. This fact was discovered by the government when investigators obtained possession of a bill sent to Dr. McMahon by his then counsel. The bill

_____

[5] That definition was set forth as follows:

> Structure (structuring). For purposes of section 103.53, a person structures a transaction if that person, acting alone, or in conjunction with or on behalf of other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under section 103.22 of this Part. "In any manner" includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000.00 into smaller sums, including sums at or below $10,000 or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.

J.A. at 1665.

9

had been discarded in the trash dumpster in the parking lot at the clinic operated by Dr. McMahon.

Within a couple of weeks thereafter, in March 1993, at the direction of Dr. McMahon, John McMahon began liquidating the stocks in Dr. McMahon's personal brokerage/margin account held by U.S. Clearing Corporation in New York. This was done in a series of transactions, followed immediately by six wire transfers of the resulting funds to a Virginia bank account in the name of Gravitech, a dormant business account controlled by Appellants. Each of the six wire transfers ordered by John McMahon was for an amount less than $10,000.**6**

Thus, the gravamen of the antistructuring conviction (the only count on which John McMahon was convicted) was the March 1993 transactions described in this paragraph. From March 17 through March 31, 1993, five checks drawn on the Gravitech account were presented to Horizon Bank by Appellants on a closely-coordinated schedule. For example, Dr. McMahon presented the first check, in the amount of $4,900, at 12:30 p.m. on March 17, 1993, after a $5,000 wire transfer from New York had been effected as ordered by John McMahon six days earlier. Less than an hour later, at 1:14 p.m. on the same day, John McMahon, located at Manna Financial's offices

_____

**6** John McMahon offered evidence in his defense, including his own testimony. Thus, the jury had before it John McMahon's testimony that the seemingly suspicious timing of the stock sales and wire transfers effected to liquidate the investment account was in fact driven by market conditions, and not an attempt to maintain less than $10,000 in the Gravitech account at the time of each subsequent cash withdrawal from the Gravitech account discussed in text. However, there was evidence which seriously undermined this explanation. The jury learned that within days of the completion of the Gravitech-related transactions, John McMahon also liquidated approximately 75% of Dr. McMahon's IRA stock account in a single transaction, with no significant change in the prevailing "market conditions." Moreover, Barry Richard Smith, Executive Vice-President at Manna Financial and John McMahon's supervisor, testified that it was "unusual" to send the funds from a margin account in a series of transactions rather than in one transaction. He further testified that he had never before seen a margin account at Manna Financial liquidated in the manner John McMahon conducted the transaction for his brother.

a block or so away from Horizon Bank, faxed a document to U.S. Clearing in New York directing that an additional $9,000 be wired to the Gravitech account at Horizon Bank. At 1:11 p.m. the next day, March 18, John McMahon presented a check drawn on the Gravitech account for $9,000. The remaining three checks were negotiated under similar circumstances. The government never uncovered evidence of the final disposition of the cash funds so removed from the dormant Gravitech account, totaling $32,300 in the five transactions, each for less than $10,000, and no evidence was presented at trial which disclosed the disposition of these cash funds.

## II.

The first two assignments of error raised by Dr. McMahon relate to the manner in which the district court handled issues arising from information contained in the billing invoice from his attorney, which was recovered from the trash container on the parking lot of Dr. McMahon's clinic. The district court concluded, after hearing extensive argument on the issue, that Dr. McMahon had waived his attorney-client privilege in respect to the document when he disposed of it in the trash without effectively destroying it. Nevertheless, the district court was sensitive to the potential harm to Dr. McMahon's fair trial rights if the letter were simply admitted into evidence as a trial exhibit. Thus, by way of a compromise, rather than admit the letter, the district court permitted Dr. McMahon to enter into a stipulation regarding the letter, while preserving the issue of waiver for appeal.[7]

_____

[7] The trial judge announced the stipulation to the jury as follows:

> [T]his document was a bill to Dr. Norwood McMahon dated 3/9/93, from an attorney . . . . The bill contained billable hours of speaking together with attorneys at the U.S. Attorney's Office regarding possible charges which the government was contemplating against Dr. McMahon, and a grand jury subpoena that was served on Dr. McMahon on 2/25/93.

> The bill also charged for some time spent researching the law concerning possible charges to be brought against Dr. McMahon. The bill included time spent researching the Money Laundering Statute on 2/24/93, and 2/26/93.

J.A. 969-70.

11

Before us, Dr. McMahon contends that it was error for the court to allow into evidence the stipulation (and to allow the government to argue in summation on the basis of the stipulation) because doing so "violated the attorney-client privilege and imposed a penalty on Dr. McMahon's exercise of his Sixth Amendment rights." Appellants' Brief at 21. We disagree.

The district court correctly ruled that when Dr. McMahon discarded the intact letter in the dumpster located in the parking lot of his clinic, he waived the attorney-client privilege in respect to (1) the existence of the attorney-client relationship, as well as (2) the content of the document, to the extent the document contained what were intended to be confidential communications. Cf. Suburban Sew'n Sweep, Inc. v. Swiss-Berina, Inc., 91 F.R.D. 254, 260-61 (N.D. Ill. 1981) (client waived attorney-client privilege when intact document discarded), cited with approval in relevant part in In re Grand Jury Proceedings, 727 F.2d 1352, 1358 (4th Cir. 1984).**8**

The government correctly argues, moreover, that the content of the document (and more directly, the stipulation admitted in lieu of the

_____

**8** In Sew `n Sweep, the district court reasoned that a client had a responsibility to take steps effectively to destroy a discarded document containing confidential communications:

> Though this case presents a very close question, the court concludes that . . . the privilege not be applied to these documents. The likelihood that third parties will have the interest, ingenuity, perseverance and stamina, as well as risk possible criminal and civil sanctions, to search through mounds of garbage in hopes of finding privileged communications, and that they will then be successful, is not sufficiently great to deter open attorney-client communication. Furthermore, if the client or attorney fear such disclosure, it may be prevented by destroying the documents or rendering them unintelligible before placing them in a trash dumpster. While requiring this degree of precaution may seem extreme, if the parties feel that the likelihood of disclosure is sufficiently great, the precautions may be justified, and it is within their power to decide what precautions to take, and so to protect against disclosure.

91 F.R.D. at 260-61.

12

document) rationally supported the inference that Dr. McMahon knowingly and willfully engaged in transactions, with fraudulently obtained funds, which were designed to avoid reporting requirements. That is, a reasonable fact finder could infer that Dr. McMahon, with knowledge of the government's investigation, and having been served with a grand jury subpoena for financial records, had consulted with counsel on the legal issues surrounding alleged or suspected money laundering transactions.

As for the Sixth Amendment argument, Dr. McMahon did not raise any such claim before the district court and, indeed, did not object at all to the government's closing argument. Accordingly, the constitutional claim asserted before us has not been preserved, and we do not consider it.

III.

Dr. McMahon next contends that the district court committed reversible error in connection with its handling of certain expert witness issues. Specifically, he contends that reversal is required because: (1) the district court erred when it accepted as an expert government witness Dr. James Seeber, a chiropractor who had served on the Virginia Board of Medicine, the state regulatory body with jurisdiction over the healing arts, including chiropractic medicine; (2) the jury very likely was mislead because Dr. Seeber testified as both an expert and non-expert fact witness; and (3) Dr. Seeber committed perjury. We discern no error in these regards.

Fed. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

We have repeatedly held that a trial court's decision in accepting or rejecting the qualifications of an expert is reviewed for abuse of discretion. Westfield Ins. Co. v. Harris, 134 F.3d 608, 612 (4th Cir.

13

1998); United States v. Powers, 59 F.3d 1460, 1470-71 (4th Cir. 1995); Hardin v. Ski Venture, Inc., 50 F.3d 1291, 1296 (4th Cir. 1995); Kopf v. Skyrm, 993 F.2d 374, 378 (4th Cir. 1993); United States v. Harris, 995 F.2d 532, 534 (4th Cir. 1993).

Dr. Seeber testified as to his qualifications and experience. He had been a chiropractor since 1973, spent five years in practice with a medical doctor (one of the key areas of inquiry in this case), had served in several capacities with the Virginia Chiropractic Association, was familiar with Blue Cross bulletins sent to members of the profession and had reviewed patient files in connection with his testimony in this case. Notably, defense counsel asked no questions of Dr. Seeber on voir dire, and seemingly waived any objection to Dr. Seeber's qualifications to testify as an expert.

Moreover, contrary to Dr. McMahon's contention, Dr. Seeber's status as both an expert witness and a fact witness did not taint the fairness of the trial. While it is undoubtedly true that depending upon the circumstances of an individual case, a witness occupying such a dual status may generate concerns, cf. United States v. Thomas, 74 F.3d 676, 683 (6th Cir.) (police officer), cert. denied, 116 S.Ct. 1558 (1996); United States v. Foster, 939 F.2d 445, 453 (7th Cir. 1991) (police detective), this case is not remotely one of those circumstances. The record does not suggest in any way that the jury was confused as to Dr. Seeber's testimony, or that prejudice resulted from Dr. Seeber's testimony in his respective capacities. We find no abuse of discretion in the district court's rulings in regard to its admission of the testimony of Dr. Seeber.

Finally, the claim that Dr. Seeber committed perjury is far off the mark. The record discloses merely that Dr. Seeber testified at trial (in response to a question by the district judge) that, to his best recollection, a case, not unlike the present case, of improper billing by a chiropractor using a medical doctor's provider information, had received publicity from the state regulatory body while he served on that body. Counsel for Dr. McMahon conducted a post-trial examination of the files of the state body, and have developed discrepancies, largely if not entirely immaterial, between Dr. Seeber's recollection of the timing and sequence of events he testified to at trial, on the one hand, and

14

the actual historic record of those disciplinary proceedings, on the other hand. No basis for reversal is suggested by this showing.

IV.

Dr. McMahon next complains that reversal of his convictions for conspiracy, false claims and mail fraud is mandated because the insurance regulations he transgressed in executing his scheme to defraud are so vague and ambiguous that to permit criminal prosecution for such violations would violate his due process rights. This contention lacks merit.

The gist of the scheme perpetrated by Dr. McMahon was to operate his clinic, ostensibly in a legitimate fashion, under a so called "holistic, multidisciplinary" approach. Under this approach, Dr. McMahon had on staff, in addition to chiropractors, a medical doctor, a podiatrist and physical therapists. The government's theory, supported by non-expert and expert testimony, and direct and circumstantial evidence, was that, with this infrastructure in place, Dr. McMahon intentionally manipulated his office procedures and the insurance companies' billing requirements so as to conform claims for services rendered for chiropractic care and related treatments to the most plausible interpretation of the relevant regulations and, when that was impractical, simply to forge signatures (by use of signature stamps or otherwise), and, ultimately, to misrepresent outright the identify of the professional providing the particular service. In response to this evidence, Dr. McMahon argued in his defense that the claims were properly submitted under the medical doctor's provider number, or were administrative errors. Dr. McMahon's "good faith" defense was thoroughly covered by the district court's instructions, see J.A. at 1436-38, and Dr. McMahon raises no claim relating to the accuracy or adequacy of those instructions.

In a lengthy exegesis in his brief, see Appellants' Brief at 32-44, under the rubric of due process, Dr. McMahon simply reiterates the factual arguments in support of a reasonable doubt as to his specific intent to violate the law, which was presented to (and rejected by) the jury at trial. These arguments are unavailing here as they were below. The existence of good faith disagreements between practitioners and responsible insurance officials over the meaning and application of

15

admittedly relevant, if less than entirely clear, regulations, at the margins of debatable cases, do not equate to a due process violation on this record. Nor does evidence (generated in cross examination of the government's witnesses) that other providers, treating other patients under other circumstances, may have innocently misapplied reimbursement guidelines undermine the fairness of the jury's conclusion beyond a reasonable doubt that in Dr. McMahon's instance, he harbored no good faith misunderstanding as to the requirements of the regulations.

It suffices here to observe that the government introduced substantial evidence, summarized supra, from which a reasonable juror could conclude that the victim insurers in this case took pains to provide help to providers so that program requirements regarding reimbursable treatments were fully understood, including bulletins, handbooks, seminars and the like. In this regard, there was direct evidence from Dr. McMahon's wife that this material was received at the McMahon clinic. Other evidence, e.g., the creation of a new insurance form, and the institution of new procedures designed to hurdle barriers to insurance coverage and to do so anonymously, lent credence to the government's theory that Dr. McMahon did not commit innocent, good faith mistakes in undertaking his "holistic, multidisciplinary" approach to chiropractic care.

Thus, we have no hesitation in rejecting the due process claim based on the alleged vagueness of the regulations. To the contrary, the jury was entitled to conclude on the evidence in this record that the regulations were more than adequately understood by Dr. McMahon, and that, indeed, it was his insightful understanding of the regulations which impelled him to engage in the scheme in the first place.

V.

Dr. McMahon next contends that the evidence at trial was insufficient to prove the elements of money laundering. Specifically, he contends that the evidence was insufficient to prove beyond a reasonable doubt that he knew that the funds transferred by wire from New York to Virginia constituted the proceeds of specified unlawful activity, or that the transactions were intended to conceal or disguise the nature, location or source of ownership of the funds. See 18 U.S.C.

16

§ 1956(a)(1)(B). Dr. McMahon seems to contend that the "open and notorious" quality of the wire transfers and the related withdrawals from the dormant Gravitech account fatally undermine the government's proof on the money laundering counts. We reject this argument.

In reviewing whether the evidence was sufficient to convict a defendant, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The jury is responsible for weighing the credibility of the evidence and resolving any apparent conflicts. United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994).

To convict a defendant of conducting a "money laundering" financial transaction under 18 U.S.C. § 1956(a)(1)(B), the government must prove that (1) the funds involved in the transaction were the "proceeds of specified unlawful activity;" (2) the defendant knew that they were "the proceeds of some form of unlawful activity;" and (3) the transaction was intended by the defendant either (i) to conceal or disguise the proceeds' nature, source, control, location, or ownership, or (ii) to avoid a federal reporting requirement. See United States v. Campbell, 977 F.2d 854, 856-57 (4th Cir. 1992).[9]

The government presented substantial evidence demonstrating the existence of a fraudulent scheme in which use of the mails was an element ("specified unlawful activity"), persisting for several years, designed to obtain insurance benefits to which Dr. McMahon was not legitimately entitled. Government witnesses employed commonly

_____

[9] Indictment counts 34-39 were based on Appellants' alleged intent to "conceal or disguise the proceeds' nature, source, control, location, or ownership," i.e., the wire transfers, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); counts 40-44 were based on their alleged intent to "avoid a federal reporting requirement," i.e., the structured withdrawals from Horizon Bank in Virginia, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii). The jury acquitted John McMahon of all counts, including the money laundering counts listed here, except the substantive structuring count, count 45, discussed infra.

17

accepted accounting methods to trace the funds generated by Dr. Mc-Mahon in executing this scheme. The government is not required to prove the absence of untainted funds, or that the funds used in the money laundering transaction were exclusively derived from the specified unlawful activity. United States v. Wilkinson, 137 F.3d 214, 222 (4th Cir. 1998); United States v. Moore, 27 F.3d 969, 976 (4th Cir. 1994).

Nor is there a lack of substantial evidence to support the jury's finding that the government had proven beyond a reasonable doubt the intent "to conceal or disguise the nature, location, source ownership or control of the proceeds" of "specified unlawful activity." The transactions in question involved personal funds belonging to Dr. McMahon held in a brokerage account, transferred by wire to a dormant business account, shortly after he had received a subpoena for personal financial records in connection with a federal investigation of a fraudulent billing scheme. In sum, there was substantial evidence to support the jury's finding, as required by the district court's instructions, that Dr. McMahon intended to conceal or disguise the nature, location, source ownership or control of the proceeds.

Contrary to Dr. McMahon's assertions, the mere fact that a "paper trail" was generated by the transactions did not diminish the probative value of the government's proof by circumstantial and direct evidence of his intent attendant to the transactions. Thus, we are satisfied that there was substantial evidence supporting the disputed elements of the money laundering counts.

VI.

Both Appellants challenge their convictions for unlawful structuring (count 45) on extremely narrow grounds. Specifically, John McMahon contends that the government's circumstantial evidence was insufficient to establish proof beyond a reasonable doubt that he knew of a bank's obligation to report a customer's withdrawal of cash (in contrast to a reporting requirement arising from a deposit of cash). Dr. McMahon argues, in turn, that since the only basis for his conviction was, according to him, the jury's assumption that his brother advised him of the reporting requirement, his conviction also is unsupported

18

by substantial evidence. We disagree with both strands of this argument.

We recently explained:

> Financial institutions are required by law to file a CTR for a transaction or series of transactions involving currency in excess of $10,000. See United States v. Beidler , 110 F.3d 1064 (4th Cir. 1997); 31 U.S.C. § 5313(a). It is unlawful for a depositor to structure the deposits for the purposes of avoiding the reporting requirement. See 31 U.S.C. § 5324(a)(3). When the unlawful conduct occurred in this case the Government was required to show that the defendant willfully violated the antistructuring law. See 31 U.S.C. § 5322(a)(b) (1988). "To establish that a defendant `willfully violated' the antistructuring law, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." Ratzlaf v. United States , 510 U.S. 135, 137, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994).

United States v. Messer, 139 F.3d 895, #6D 6D6D# (4th Cir. 1998).

We have been cited to no authority, and we have found none, which supports the contention that the government's burden in a structuring prosecution is to prove specifically that a defendant knew that cash deposits (if those are the facts shown by the evidence) and/or cash withdrawals (if those are the facts) trigger a reporting requirement. To the contrary, the statute, and the Supreme Court's decision in Ratzlaf, make it plain that the prohibition relates to transactions engaged in willfully with the specific intent to evade or cause the evasion of the reporting requirements. For example, in Ratzlaf the Court summarized: "In § 5322, Congress subjected to criminal penalties only those `willfully violating' § 5324, signaling its intent to require for conviction proof that the defendant knew not only of the bank's duty to report cash transactions in excess of $10,000, but also of his duty not to avoid triggering such a report." 510 U.S. at 146-47. (emphasis added).

Appellants concede that "the jury certainly could have concluded that [John McMahon] knew what a trade or business was required to

19

file when it <u>received</u> cash in excess of $10,000." Appellants' Brief at 52. We hold that this concession indicates Appellants' agreement that the government introduced sufficient evidence to prove knowledge of illegality of the <u>transaction, which is the only burden the law imposes upon the government</u>.

In any event, even apart from the above concession, the circumstantial evidence against Appellants, summarized <u>supra</u>, was substantial, and supports the jury's finding, as required by the district court's instructions, that Appellants acted willfully to violate the antistructuring statute prosecuted in count 45. We have held that, in reviewing for sufficiency of the evidence of a structuring conviction, we permit a jury to infer willfulness from the defendant's attempt at concealment of the structuring activity. <u>United States v. Beidler</u>, 110 F.3d 1064, 1069 (4th Cir. 1997). We are persuaded that the evidence in this case -- the seriatim wire transfers of funds into the Gravitech account, and the fact that, for a period of time up until the structured transaction, the Gravitech account was a dormant account in the name of a non-operating business -- constitutes evidence of an attempt at concealment, notwithstanding the "paper trail" the transactions generated. Furthermore, we have also observed that

> [i]n the wake of <u>Ratzlaf</u>, other courts have sustained convictions for willful violations of the antistructuring law only when the prosecution has presented "something more" than evidence of structuring itself. Specifically, in addition to the structuring itself, courts have relied on evidence of a defendant's general consciousness that he acted illegally or <u>evidence that a defendant had some special status or expertise from which a jury could reasonably infer that he knew structuring was illegal</u>. <u>See, e.g., United States v. Simon</u>, 85 F.3d 906, 909-10 (2d Cir. 1996) (in addition to evidence of structuring, defendant, as a stockbroker, was familiar with the reporting requirements and, in fact, was required to file CTRs in his business).

<u>United States v. Ismail</u>, 97 F.3d 50, 58 (4th Cir. 1996) (emphasis added). This observation has relevance under the circumstances of this case. John McMahon's status as a highly educated and trained stockbroker/certified financial planner, literally surrounded for years

20

prior to the suspicious activities by information about the evils of structuring, was a significant and weighty piece of the government's evidentiary matrix on which the jury could reasonably rely in reaching its verdict.

Accordingly, although we agree with the district court that, as to John McMahon, the evidence on the willfulness element of the antistructuring count was not overwhelming, we have no hesitation in affirming the antistructuring conviction of each Appellant. We are persuaded that the jury's guilty verdicts were rationally based on permissible inferences about Appellants' knowledge of the law's requirements, and that Appellants willfully aided and abetted each other in effecting the $32,300 transfer of funds from New York to and through the Gravitech account at Horizon Bank, with the intent to cause Horizon Bank to fail to do what it would have been legally obliged to do -- file a CTR -- in the absence of the structuring.

VII.

John McMahon contends that he was deprived of a fair trial by virtue of the admission into evidence of the NASD notices regarding the antistructuring statutes. We discern no abuse of discretion in the district court's admission into evidence of these exhibits. Moreover, the reasonableness of the inference that John McMahon very likely reviewed them after he commenced work at Manna Financial a few weeks or so after they were received was amply supported by the testimony of his supervisor at the firm.

VIII.

John McMahon also complains of the district court's instruction on "deliberate ignorance." The decision whether to give a jury instruction and the content of an instruction are reviewed for abuse of discretion. United States v. Russell, 971 F.2d 1098, 1107 (4th Cir. 1992), cert. denied, 506 U.S. 1066 (1993). We recently noted in a closely analogous case:

> Generally, one cannot be convicted based upon what one should have known . . . . Actual knowledge can be found if

21

> the defendant was aware to a high probability of the true nature of the transactions and deliberately chose to avoid finding the truth for fear the true nature would be revealed. Such "willful blindness" extends the reach of the actual knowledge requirement. See Campbell, 977 F.2d at 857.

Messer, 139 F.3d at ___. We have also noted that "where the evidence presented in the case supports both actual knowledge. . . and deliberate ignorance, a willful blindness instruction is proper." United States v. Abbas, 74 F.3d 506, 513 (4th Cir.), cert. denied, 517 U.S. 1229 (1996).

Although the government presented substantial circumstantial evidence in its case-in-chief of John McMahon's actual knowledge of the illegality of structuring, John McMahon generated the issue of willful ignorance through his own testimony during the defense case. Furthermore, the inference of willful ignorance was supported by evidence of the elaborate machinations disclosed by the transfer of the $32,300 in eleven discrete steps, i.e., six wire transfers (involving a fee of $15 each) and five trips to the bank, over a short period of time. Accordingly, the district court did not abuse its discretion in charging the jury on "deliberate ignorance."

IX.

Finally, John McMahon contends that the district court erroneously declined to admit evidence of his "consciousness of innocence." This claim arises from a proffer by John McMahon to testify concerning an ambiguous and unconsummated effort at plea bargaining. This Circuit has not had occasion to pass upon the issue of admissibility of so-called "consciousness of innocence" evidence, which is said to be present where a defendant rejects an offer of immunity in return for testifying on behalf of the government. See United States v. Biaggi, 909 F.2d 662, 690 (2d Cir. 1990), cert. denied , 499 U.S. 904 (1991). We need not do so here because it is clear that the district court did not commit an abuse of discretion in concluding that the ambiguous discussions between counsel never rose to the level of an offer of immunity from the government to John McMahon.

22

X.

For the reasons discussed above, we conclude that the district court committed no reversible error, that the Appellants received a fundamentally fair trial. The judgments of conviction are accordingly

AFFIRMED.

23