PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RAYMOND DAYLE ROWSEY,
          *Petitioner-Appellant,*

v.

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
          *Respondent-Appellee.*

No. 02-16

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(CA-00-631-1)

Argued: January 21, 2003

Decided: April 24, 2003

Before WIDENER, WILKINSON, and NIEMEYER,
Circuit Judges.

_____

Affirmed in part and dismissed in part by published opinion. Judge
Wilkinson wrote the opinion, in which Judge Widener and Judge Nie-
meyer joined.

_____

## COUNSEL

**ARGUED:** Wayne James Payne, POWELL & PAYNE, Shallotte,
North Carolina; Michael R. Ramos, RAMOS & LEWIS, Shallotte,
North Carolina, for Appellant. Steven Mark Arbogast, Special Deputy
Attorney General, NORTH CAROLINA DEPARTMENT OF JUS-

TICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Roy Cooper, Attorney General of North Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Appellant Raymond Dayle Rowsey was convicted by a North Carolina jury of first-degree murder on the bases of premeditation and deliberation and felony murder, as well as robbery with a firearm. He was sentenced to death for the murder. After exhausting state remedies, Rowsey petitioned the United States District Court for the Middle District of North Carolina for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied his petition, and Rowsey now appeals. We affirm in part and dismiss in part.

I.

On the evening of March 23, 1992, Rowsey and his half brother, Raymond Lee Steele, were hanging out at Steele's house, playing cards and listening to the radio. Shortly after midnight, the two men decided to walk to a local Circle K convenience store. They arrived at the store around 1:00 a.m.

Once at the store, the men obtained some change from the store clerk, Howard Rue Sikorski, and played several dollars worth of video games. Next, they went to the back of the store to look at the movie display. Rowsey then decided he wanted to buy a snack. Steele gave Rowsey two dollars and Rowsey picked up two bags of M&M's and paid for them at the counter. Rowsey then pulled a gun out of his coat, pointed it at Sikorski, and clicked the gun without firing it. He turned and smiled at Steele, telling Steele that he had scared the store clerk with a water gun.

The gun, however, was not a water gun. Rowsey turned back towards the victim and shot him in the face. After the victim fell to

the floor, Rowsey leaned over the counter and shot him again. Rowsey then ran around the counter, fired at least two more shots, and kicked the victim three or four times in the back of the head.

Steele ran out of the store and Rowsey ran out after him, still carrying the gun in one hand and something else underneath his arm. During the walk home, Steele asked Rowsey why he shot the victim. Rowsey said he was initially just playing, but he thought that he saw the victim reaching underneath the counter for a gun. Rowsey later told Steele that he kicked the victim to ensure that the victim died. He also told Steele, however, that the victim was still alive and gasping for air when Rowsey ran out of the store.

Back at Steele's house, Rowsey counted the cash that he had taken from the Circle K cash register. He told Steele that he had grabbed the money to make the shooting look like a robbery and to make the shooting worthwhile. In total, Rowsey took $54.00 in cash and several adult magazines from the store. Steele would not accept half of the money, but did accept a two-dollar bill that had been taken from the register. He also cleaned the murder weapon for Rowsey and provided Rowsey with bullets to reload the gun.

The victim's body was discovered at approximately 2:00 a.m. on March 24. An autopsy revealed six gunshot wounds: one to the face, one to the back of the neck, one to the right side of the head, and three to the back. The autopsy also revealed several blunt-force injuries to the victim's head and neck area.

Store managers determined that $57.54 in cash and several adult entertainment magazines were missing from the store. Among the missing cash was a two-dollar bill. The store had a record of the serial number of that bill which allowed police to track it. On the afternoon of March 24, Steele attempted to make a purchase with the marked two-dollar bill and was arrested shortly thereafter.

Steele initially made several false statements denying any involvement in the murder, but he eventually admitted that he was present during the murder. Rowsey was arrested later that day and subsequently charged with first-degree murder and armed robbery. Steele

pled guilty to second-degree murder and robbery with a dangerous weapon in exchange for his testimony at trial.

At trial, Rowsey tried to finger Steele as the shooter. Rowsey questioned Steele regarding a letter that Steele had written to Rowsey that allegedly concluded with the phrase "even though you didn't do it." Steele admitted to writing the letter, but denied writing the concluding line. Rowsey also introduced testimony from two jail inmates who testified that they overheard conversations between Rowsey and Steele during which Steele acknowledged that he, not Rowsey, had killed the victim. The State countered this testimony, however, with substantial evidence indicating that Rowsey was the shooter. The State introduced evidence of Rowsey's shoe prints in the blood around the victim's head, and evidence that Rowsey possessed the murder weapon both before and after the murder. Furthermore, Steele provided extensive testimony recounting the events of the murder and bolstering the State's claim that Rowsey was the shooter.

Given the weight of the evidence, the jury concluded that Rowsey was indeed the shooter and convicted him of both first-degree murder and armed robbery. At sentencing, Rowsey introduced evidence indicating that he had come from a broken home and suffered a difficult childhood. The State introduced evidence that Rowsey had broken into a church and stolen $900.00 worth of items only weeks before the murder. The State also introduced evidence of Rowsey's prior criminal record, which included fifteen counts of injury to personal property in 1990, one count of possession of a malt beverage by a minor in 1990, and two counts of misdemeanor larceny in 1991.

The jury returned a recommendation of death. On October 1, 1993, the trial judge entered judgment and sentenced Rowsey to death. The Supreme Court of North Carolina affirmed the conviction and sentence, *State v. Rowsey*, 472 S.E.2d 903 (N.C. 1996), and the United States Supreme Court denied certiorari, *Rowsey v. North Carolina*, 519 U.S. 1151 (1997).

Rowsey then filed a motion for appropriate relief (MAR) in North Carolina state court. *See* N.C.G.S. § 15A-1401 (2002). The state MAR court entered an order directing discovery and denying Rowsey the right to proceed ex parte for the purpose of seeking a mitigation

expert. The state MAR court heard arguments from counsel but did not hold an evidentiary hearing. By order dated October 14, 1999, the state court denied Rowsey's MAR, and the North Carolina Supreme Court denied certiorari on June 15, 2000.

Next, Rowsey filed a petition for writ of habeas corpus in the United States District Court for the Middle District of North Carolina. A United States magistrate judge reviewed Rowsey's petition and recommended dismissal. On February 26, 2002, the district court adopted the magistrate judge's recommendation. *Rowsey v. Lee*, No. 1:00CV631 (M.D.N.C. Feb. 26, 2002). The district court also declined to issue a certificate of appealability (COA). *Id.* Rowsey now appeals.

## II.

"Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from [ ] the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." 28 U.S.C. § 2253(c)(1)(A) (2003). A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.*

A court's determination of a petitioner's claims is guided by the principles set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), which limits federal review of collateral attacks on state convictions. Under § 2254(d)(1), federal courts may not grant a writ of habeas corpus when a state court has already resolved the merits of a claim, unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (2002).

A state court decision is contrary to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision is contrary to clearly established Supreme Court precedent "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from

[that] precedent." *Id.* at 406. A state court decision involves an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08.

If the district court applies the deferential AEDPA standard and rejects a petitioner's constitutional claims on the merits, the petitioner must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Otherwise a COA will not issue.

After oral argument in this case, the Supreme Court elaborated on this requirement in *Miller-El v. Cockrell*, 123 S. Ct. 1029 (2003).

> As mandated by federal statute, a state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition . . . . The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable amongst jurists of reason . . . . To that end, [the Supreme Court's] opinion in *Slack* held that a COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief.

*Id.* at 1039 (internal citation omitted).

On the other hand, the Supreme Court made clear that its holding "should not be misconstrued as directing that a COA always must issue. Statutes such as AEDPA have placed more, rather than fewer, restrictions on the power of federal courts to grant writs of habeas corpus to state prisoners . . . . It follows that issuance of a COA must not be *pro forma* or a matter of course." *Id.* at 1039-40 (internal citation omitted).

In this case, Rowsey argues that (1) Rowsey's due process rights were violated by the bias and partiality of the trial judge; (2) the state unconstitutionally applied its capital sentencing statute by arbitrarily deciding to seek the death penalty in Rowsey's case; (3) Rowsey's right to effective assistance of counsel was violated when his trial counsel failed to seek a clarification of a juror's response to questions during the jury poll; and (4) Rowsey's due process and equal protection rights were violated by the imposition of a death sentence when the trial jury did not return a unanimous death verdict. We address each argument in turn under the above standards.

## III.

First, Rowsey argues that his due process rights were violated by the trial judge's bias and partiality against him. Both the MAR court and the district court denied this claim. In order to determine whether a COA should issue, we ask whether jurists of reason could have resolved this claim differently. *Miller-El*, 123 S. Ct. at 1039. While we grant the COA, we affirm the district court judge's dismissal of the claim.

Rowsey alleges that the trial judge made nineteen separate comments that demonstrate unconstitutional bias. These comments included statements that the trial judge "was never going to try another capital case;" that the judge "did not like any individual voir dire;" that if individual voir dire was granted the judge "would go back to Durham and wait three weeks and [counsel should] call him when they were through;" that "any delay or what he considered delay would affect [trial counsel's] compensation;" and that if the jury returned a death sentence, "the defendant [should] be taken from the courthouse to the Circle K where the murder occurred, shot six times and stomped in the head." Rowsey argues that these comments, taken together, prove that the judge was not impartial in his case. For his part, the judge had no recollection of making the alleged statements.

While "a fair trial in a fair tribunal is a basic requirement of due process," not all claims of bias rise to a constitutional level. *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (quoting *In re Murchinson*, 349 U.S. 133, 136 (1955)). In order to prevail in a deprivation of due process claim, a defendant must show a level of bias that made "fair

judgment impossible." *Liteky v United States*, 510 U.S. 540, 555 (1994). The state MAR court reviewed the entire record and found that "the trial judge conducted the trial in a fair and impartial manner" and the district court agreed. Given the nature of some of the comments, however, we recognize that reasonable jurists might find the district court's assessment debatable. We therefore issue a COA on this claim and proceed to the merits. The question now turns to whether the state MAR court's decision was contrary to, or an unreasonable application of, clearly established Federal law. *See Williams v. Taylor*, 529 U.S. 362.

"[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism . . . ." *Liteky*, 510 U.S. at 555. Most of the comments Rowsey alleges the trial judge to have made demonstrate "expressions of impatience, dissatisfaction, annoyance, and even anger," and do not rise to the level of impermissible judicial bias. *Id.* at 555-56. We do agree with the district court that some of the alleged remarks, such as the suggestion that the victim "was gay and the defendant was probably a latent homosexual," "push[ed] private judicial commentary to its ethical limit." All of the alleged comments, however, were made outside the presence of the jury. Rowsey points to nothing the trial judge said or did in the jury's presence that would portray a biased outlook on his case. It was the jury, not the trial judge, that found Rowsey guilty and recommended a sentence of death. Therefore in order to argue that he was deprived of a fair trial, Rowsey must also show that the trial judge's bias somehow affected the outlook or deliberations of the jurors.

The district court extensively reviewed the trial record and found that the trial judge went to considerable lengths to ensure that Rowsey obtained a fair trial. As the district court pointed out, the trial judge repeatedly made discretionary rulings in favor of Rowsey. For instance, during voir dire the trial judge granted Rowsey's challenges for cause several times, and even hesitated to dismiss a potential juror who stated that he would "automatically vote against the death penalty." At trial, the judge ordered a redaction of Rowsey's statement to the police that he had brandished a gun at a restaurant one day prior

to the murder, and over a hearsay objection allowed testimony by an inmate to the effect that the inmate had heard Steele admit to being the shooter.

Despite these numerous rulings in Rowsey's favor, Rowsey argues that the trial judge's bias played a role in the judge's decision to submit, over Rowsey's objection, the statutory mitigating circumstance that Rowsey had no significant history of prior criminal activity. Under North Carolina law, if the evidence presented might support a statutory mitigating circumstance then the judge must submit that circumstance, even over the defendant's objection. *Rowsey*, 472 S.E.2d at 911 (citing *State v. Ingle*, 445 S.E.2d 880, 893 (N.C. 1994)). On direct review the North Carolina Supreme Court held that because Rowsey's prior convictions consisted of mostly property crimes and no felonies, a rational juror could have concluded that Rowsey did not have a significant prior criminal history, and that the submission of the mitigating factor was mandatory. *Id.* at 912. We agree with the North Carolina Supreme Court and find no basis for the assertion that the trial judge's decision was motivated by improper bias.

Rowsey has offered no evidence that the trial judge's alleged partiality in any way affected Rowsey's right to a fair trial. Like the district court, we cannot conclude that the state MAR court unreasonably applied clearly established federal law in holding that Rowsey received a fair trial. We therefore affirm the district court's dismissal of this claim.

IV.

Next, Rowsey argues that N.C.G.S. § 15A-2000, North Carolina's Capital Sentencing Statute, was applied to deny him his equal protection rights. Rowsey argues that his co-defendant Steele was as culpable as he was. Because Steele was permitted through a plea bargain to avoid the possibility of a death sentence, Rowsey contends North Carolina's decision to try him capitally was arbitrary and in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. The state MAR court denied this claim and the district court found that the MAR court's decision was not contrary to, or an unreasonable application of, clearly established federal law. We

inquire only whether "[the district court's] resolution was debatable amongst jurists of reason." *Miller-El*, 123 S. Ct. at 1039.

"[T]he decision to prosecute is particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). The government therefore retains broad discretion in prosecutorial decisions, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute," and the decision to prosecute is not "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (internal quotations omitted).

"The requirements for a selective-prosecution claim draw on ordinary equal protection standards." *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (internal quotations and citation omitted). To succeed on a selective-prosecution claim, a defendant must demonstrate that the prosecutor's decision "was based on an unconstitutional motive." *Wade v. United States*, 504 U.S. 181, 185-86 (1992).

Rowsey does not even allege that his prosecutor was motivated by a discriminatory purpose. Instead, he contends that the prosecutor used "unarticulated criteria" to seek the death penalty in his case. Rowsey's entire argument rests on his assessment that Steele was at least as culpable as he was, and that a decision to seek the death penalty for Rowsey but not Steele was arbitrary and based on impermissible factors.

Rowsey's premise, however, is flawed. The State advanced substantial evidence indicating that he was the shooter. As the district court pointed out, the State introduced evidence of Rowsey's shoe prints in the blood surrounding the victim's head, as well as evidence that Rowsey possessed the murder weapon both before and after the murder. After examining this evidence and listening to Steele's testimony, which was subject to extensive cross-examination, the jury concluded that Rowsey was indeed the shooter. Contrary to Rowsey's argument, then, there were significant factors to distinguish the two cases.

The MAR court found that Rowsey failed to submit any evidence supporting a claim that the prosecution was motivated by a discrimi-

natory purpose, and the district court agreed. In fact, Rowsey does not even purport to demonstrate what unconstitutional criteria the prosecution employed in his case. In light of the dearth of evidence demonstrating any discriminatory purpose, Rowsey has failed make a substantial showing of the denial of his equal protection rights. *See* 28 U.S.C. § 2253(c)(2).

## V.

Rowsey's final claims all relate to the same incident, the jury poll of juror Eleanor Leath. Rowsey claims: (1) that the failure of trial counsel to object to the poll of Leath or ask for a clarification of her response constitutes ineffective assistance of counsel; and (2) that the trial jury did not return a unanimous death verdict because Leath did not intend to assent to such a verdict. Rowsey supports these claims, in part, with an affidavit submitted by Leath, more than four years after the trial, attesting that she did not intend to assent to the death sentence.

## A.

As to the ineffective assistance of counsel, Rowsey argues that because Leath became emotional during the jury poll and did not initially answer the trial judge's question, trial counsel should have objected and asked the trial judge to obtain a clarification of Leath's response. The state MAR court denied this claim and the district court found the state court's application of Supreme Court precedent reasonable.

Under N.C.G.S. § 15A-2000, the jury sentence recommendation for capital felonies must be unanimous. After the jury foreman delivers the recommendation, the trial judge must poll each juror to ensure that each juror agrees to the sentence recommendation. N.C.G.S. § 15A-2000(b)(3) (2002).

The trial transcript reveals the following exchange during the jury poll between Leath and the trial judge:

THE COURT: Ms. Leath, Ms. Leath, your foreman has announced that the verdict of the jury is

|               | [ ] that the defendant, Mr. Rowsey, be sentenced to death, was that your verdict and do you still agree to that as being your verdict in this case? |
|---|---|
| MS. LEATH:    | (No response) |
| THE COURT:    | Ms. Leath, I'll repeat the question. Ms. Leath, your foreman has announced that the verdict of the jury is [ ] that the defendant, Mr. Rowsey, be sentenced to death, was that your verdict and do you still agree to that as being your verdict in this case? |
| MS. LEATH:    | (No response, becomes emotional.) |
| THE COURT:    | Ms. Leath, do you have an answer to the question? |
| MS. LEATH:    | Yes (nods affirmatively). |
| THE COURT:    | And was your answer yes, ma'am? |
| MS. LEATH:    | Yes. |
| THE COURT:    | Madam Court Reporter, did you hear that and record it? |

(Court reporter nods affirmatively)

|               |           |
|---|---|
| THE COURT:    | All right. |

After the judge polled the remaining five jurors, he asked the attorneys whether they had "[a]nything else in connection with the poll of the jurors?" Counsel both responded "no."

   Rowsey argues that counsel's failure to object to the poll was ineffective. In order to determine whether to grant a COA on this claim,

we must briefly consider it against the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court set forth a two part test for deciding ineffective assistance of counsel claims. First, the defendant must show that, considering all of the circumstances, "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, a defendant must show that the deficient performance resulted in actual prejudice. To satisfy the second prong of *Strickland*, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Rowsey submitted an affidavit from an experienced North Carolina attorney in support of his *Strickland* claim, attesting that trial counsel fell below an objectively reasonable standard of representation by failing to object to the jury poll. We need look no further than the trial transcript, however, to find that trial counsel's actions were objectively reasonable. Leath was the sixth juror polled at the sentencing hearing, and received the same question as the five jurors polled before her. When Leath did not respond to the question, the judge repeated it. Leath again failed to respond, and the judge asked her if she had an answer to the jury poll question. Leath nodded yes, indicating that she had an answer to the jury poll question. The judge then referred back to the jury poll question, inquiring whether Leath's answer was yes. She replied "yes."

Both the circumstances surrounding the poll and the dialogue between the trial judge and Leath show that it was not unreasonable for trial counsel to accept Leath's assent to the verdict. The jury foreman announced that the jury had unanimously decided to recommend a sentence of death. While Leath became emotional as a result of this decision, nothing in her responses indicated that the jury foreman had misinterpreted her assent or that she had changed her mind since the jury deliberations. Furthermore, Leath gave absolutely no indication that the trial judge had misinterpreted her answer when he proceeded to poll the five remaining jurors. And the North Carolina Supreme Court, considering a separate claim based on the same dialogue, held that "a reasonable juror would have understood that the trial court's final question was referring to the critical question of whether she assented to the jury verdict." *Rowsey*, 472 S.E.2d at 914.

Death sentences often produce emotional responses from the jurors who impose them. It is precisely because of this fact, however, that we must rely on the trial transcript and the surrounding circumstances of the trial to determine the reasonableness of counsel's conduct. Rowsey does not suggest that a "no" answer was given. Rather, he argues that Leath somehow intended to say "no." It would be a dangerous step to base our decision on a juror's recollection, years after the fact, of his or her internal emotions and thought processes at the time of the trial. This is especially true where no one has questioned whether Leath answered "yes" to each of the questions asked of her. Here, the trial court took great care to ensure that Leath assented to the verdict, despite the fact that under North Carolina law a verbal response is not required. *See State v. Spruill*, 360 S.E.2d 667, 697-98 (N.C. 1987). It was therefore reasonable for trial counsel to accept the jury poll as proper.

### B.

Rowsey's final claims also rest on the proposition that Leath did not intend to assent to the death verdict. Rowsey argues that "the trial judge induced Juror Leath to assent to a verdict to which she disagreed." Because Leath did not intend to assent to a death sentence, Rowsey argues that the State failed to follow its own process by imposing the death penalty without a unanimous verdict.

On direct review, the North Carolina Supreme Court held that the trial court properly conducted the jury poll and that Leath freely, without any improper coercion, assented to the verdict. *Rowsey*, 472 S.E.2d at 913-14. Rowsey requested an evidentiary hearing on this matter, but he could not produce before the district court any evidence, aside from Leath's affidavit, contradicting the clear showing of Leath's assent in the trial transcript. We therefore agree with the district court's finding that these claims are wholly without merit and decline to issue a COA.

### VI.

Although Rowsey's judicial bias claim meets the § 2253 criteria for issuance of a COA, that claim is without merit under the deferential AEDPA standard. Rowsey fails to make a substantial showing of the

denial of a constitutional right on any of his other claims. We therefore affirm the district court's dismissal of Rowsey's initial claim, and decline to issue a COA on Rowsey's remaining claims.

*AFFIRMED IN PART AND DISMISSED IN PART*