Ralph RAMEY, Movant,

v.

UNITED STATES of America,
Respondent.

Nos. CIV.A.2:02–0866, CIV.A.2:02–088.
No. CRIM.2:92–00140–01.

United States District Court,
S.D. West Virginia,
Charleston Division.

May 6, 2003.

Ralph Ramey, Ashland, KY, pro se.

Kasey Warner, Michael L. Keller, United States Attorney's Offfice, Charleston, WV, for Respondent.

## MEMORANDUM OPINION AND ORDER

HADEN, District Judge.

Pending are Movant's (1) motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255, and (2) motion for modification of sentence pursuant to 18 U.S.C. § 3582. This action was previously referred to the Honorable Mary E. Stanley, United States Magistrate Judge, who has submitted her original and revised Proposed Findings and Recommendations (PF & Rs) pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B). Movant and Respondent objected. The Court proceeds with *de novo* review.

## I. FACTUAL BACKGROUND

In July 1989, Alex Nelms began cohabiting with his girlfriend, Jo Ann Vance, in her home on Long Fork in Pecks Mill, West Virginia. Mrs. Nelms' residence consisted of a mobile home situated on 12 acres of family-owned property located across the road from Olive Payne, the mother of Movant's co-Defendant, James "Bo" Payne.

Immediately after Nelms moved into Vance's residence, the couple became the targets of racially motivated harassment. Taunting incidents of harassment continued for approximately one year, culminating on June 3, 1990 in the complete de-

struction of Vance's home by fire. The fire was later determined to be arson.

In the late evening of June 3, 1990, as Nelms and Vance were retiring for the night, Nelms heard a sound of liquid splashing against the outside of the bedroom wall to the trailer. Nelms looked outside of the bedroom window and observed a line of fire leading from a tree and traveling toward the end of the residence. In their escape from the burning residence, Mr. Nelms observed another line of fire, but his attempts to extinguish it were unsuccessful. The home was quickly engulfed in flames and burned to the ground in approximately 15 minutes.

A subsequent FBI investigation disclosed how the fire occurred and who was responsible for its ignition. In approximately April 1990, Movant made statements to his sister-in-law that he "couldn't stand to see a white woman living with a nigger," and that "someone should burn their house down." Prior to the fire, Movant made the statement to a key witness and the sister-in-law of that witness that he intended to "burn the nigger out."

On the night of the fire, Movant was not at his residence. When he returned home after midnight, he told his sister-in-law and his wife that Nelms' house burned to the ground and there was no evidence of who did it. After the investigation of the fire began, Movant asked an acquaintance, Gilmer Mister, to advise some people in the hollow "not to mess" with him because he had "taken care of the nigger." Movant's wife Margaret told FBI agents her husband admitted to her on previous occasions that he and Payne had burned a trailer in Pecks Mill, West Virginia. Margaret also told investigators Movant had known Nelms and Vance were in the trailer before the fire was started because he told her he had seen them turn off their lights.

Mister testified that three to four months prior to the fire, he had heard Payne call Vance "white trash." He further reported hearing Payne state that "if they were smart, someone could sneak up and fire bomb the trailer." According to Mister, Payne suggested they stick together on their alibis. Mister, however, reported he did not believe either Movant or Payne were serious in their intent to burn the Vance–Nelms residence until the evening of June 3, 1990.

On June 3, 1990, after a day of drinking and smoking marijuana, Jerry Green drove Payne and Movant to the residence of Payne's brother-in-law, Delbert White. At White's residence, they siphoned gasoline into a plastic milk jug and gave it to Payne. When Green inquired, Movant stated they were going to "burn the nigger out." Green refused to participate but dropped Payne and Ramey off approximately a quarter of a mile from the Vance–Nelms residence.

After being dropped off by Green, Movant and Payne walked to Olive's home. After arriving there, Movant and Payne sat on her porch conversing with her until she went to bed. Movant and Payne then poured gasoline, forming a trail, from the edge of Olive's property to the wall of the trailer's bedroom and in front of a door and then set fire to the gasoline.

On May 29, 1992 a four-count indictment naming Movant and Payne was returned by a federal grand jury sitting in Huntington. Count One charged a conspiracy against civil rights, in violation of 18 U.S.C. § 241. Count Two charged violation of the Fair Housing Act and aiding and abetting the same violation, in contravention of 42 U.S.C. § 3631(a) and 18 U.S.C. § 2. Count Three charged the use of fire in the commission of a felony offense, in violation of 18 U.S.C. § 844(h)(1). Count Four charged a violation of 18

U.S.C. § 844(i), destruction of a property affecting interstate commerce by arson.

Movant was arrested on June 2, 1992 pursuant to the grand jury charges. He made an initial appearance before the Court and was released on a $10,000.00 unsecured bond pending trial and placed on pretrial supervision. His bond was revoked subsequently when testimony revealed he had made verbal threats and statements of a threatening nature toward both a federal witnesses and a federal judicial officer.

Ramey also attempted to misdirect the investigation and prosecution of his case by giving false information about the offense. On June 3, 1992, after being advised of his rights, Movant told FBI Special Agent Jim Sullivan that Jerry Green started the fire. Movant then telephoned his wife and step-daughter at the time, during his trial, and attempted to convince them not to testify against him.

Movant and Payne maintained their innocence and proceeded to trial. On November 18, 1992 the jury found both guilty as charged on all four counts. On February 18, 1993 the Court imposed sentence and entered Judgment as follows: (1) 108 months imprisonment on Counts One and Four; (2) 12 months imprisonment on Count Two, to be served concurrent with the sentences imposed on Counts One and Four; and (3) a term of 60 months imprisonment on Count Three, to be served consecutive to the sentences imposed on Counts One, Two, and Four.

During the sentencing hearing, a controversy arose concerning application of the 1989 Guidelines. A colloquy between defense counsel Marc Turgeon, the Court, and Government counsel Jim Oliver ensued:

MR. TURGEON: I believe the most important matter is that the grouping of the offenses requires, I believe, that the government or the probation office assign an offense level to each count of the indictment once they are grouped. *I believe that under—it is a critical matter to this defendant that the 1989 version of the guidelines be used* because as the presentence report stands 2H1.1 in 1989 version of the guideline, which applies to Mr. Ramey because the offense occurred June 3 of 1990, refers exclusively to going in disguise on the highways.

.        .        .        .        .

THE COURT: Well, I think this is an important point to know which set of guidelines is applicable to the defendant's sentencing, whether it's the 1989 version or the 1992 version. *If they are exactly the same and there is no detriment to the defendant in applying the 1992 guidelines, I would apply the 1992 guidelines. If, on the other hand, there is a benefit to the defendant in the application of the '89 guidelines, which is not present in the '92 guidelines, then I ought to apply the '89 guidelines.*

MR. OLIVER: The United States' position is that Mr. Ramey does benefit from the 1989 version of the guideline on this theory. *Were we to use the 1992 version of the guideline, the government would submit that the underlying offense level—underlying offense conduct to be looked for in utilizing the civil rights conspiracy guideline would, in fact, be a conspiracy to commit murder. That guideline is found at 2A1.5 of the '92 guideline. That would give Mr. Ramey a 28 base offense level plus 2 for the civil rights motivation, which would result in a base offense level before any obstruction or vulnerable victim were to be applied of a 30. Consequently, it's our view that Mr. Ramey does receive a benefit form the 1989 guideline....*

THE COURT: Okay. Then I take it the defense and the government are in agreement on that point.

MR. OLIVER: I am not sure about that part of it.

THE COURT: Well, agreement on that point that the 1989 guidelines are applicable because they are the most beneficial to the defendant.

MR. TURGEON: Yes, Your Honor.

(Sent. Trans. at 42–43 (emphasis added).)

On February 23, 1993 Movant appealed the Judgment. He asserted his (1) his arson conviction was improper because the destruction of the trailer was beyond the reach of the Congress' power to regulate interstate commerce; (2) the evidence was insufficient to warrant a conviction; and, among other challenges, (3) that it was error to enhance the sentence 18 levels because Movant knowingly created a substantial risk of death or bodily injury.

In what one panel member described as the "meanest of cases[,]" the Court of Appeals affirmed. *United States v. Ramey,* 24 F.3d 602, 610 (4th Cir.1994) (Michael, J., concurring and dissenting in part) (*Ramey I* ). Regarding the alleged sentencing error, the Court of Appeals stated:

> The defendants argue that the level should have been only 20, because the court should have picked a 12–level specific offense characteristic—arson of a residence. § 2K1.4(b)(3). They say that the concept of a "residence" necessarily implies a risk of death or bodily injury. This assertion is not quite true. The arsonist may know that a dwelling is unoccupied when he burns it, or perhaps he might burn the residence in a manner that does not create a "substantial" risk of death or bodily injury. In any event, the arson guideline contemplates that its specific offense characteristics will often overlap, and provides that the one resulting in the highest

offense level should apply. U.S.S.G. § 2K1.4(b) (1989). *The district court found that it was a mere "fortuity" that neither Vance nor Nelms was seriously injured or killed in the fire. The district court did not err in fact or law. Id.* at 610 (emphasis added). The Supreme Court denied Movant's petition for a writ of certiorari.

In 1997, Movant filed a motion pursuant to 28 U.S.C. § 2255. The Court adopted the Report–Recommendation urging the motion be denied. Movant appealed the Court's Judgment Order denying the motion. In 2000, the United States Court of Appeals vacated the Judgment Order. The partial dissent in *Ramey I* authored by Judge Michael ultimately proved prescient. Vacatur was based primarily on the abrogation of *Ramey I* in *Jones v. United States,* 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000).[1] The Court of Appeals held:

> Because Ramey was convicted and punished for an act that section 844(i) does not criminalize, we vacate the judgment of the district court and remand with instructions for the district court to set aside Ramey's conviction under section 844(i) and resentence him accordingly. We also vacate the district court's restitution schedule and remand with instructions for the court to make the findings required under 18 U.S.C. § 3664(a) to support Ramey's restitution schedule.

*United States v. Ramey,* No. 98–7069, 2000 WL 790959, at *3 (4th Cir. Jun. 20, 2000) (*Ramey II* ).

The Court ultimately appointed Michael R. Cline, one of the most respected members of the local criminal justice bar, to represent Movant for the proceedings on remand. Mr. Cline filed very detailed and lengthy objections to the revised PSR, in

---

1. The Court of Appeals also remanded for additional findings on restitution.

consultation with Movant. At resentencing, the Court utilized the same version of the Guidelines employed at the original sentencing. Movant did not object.

Using the 1989 version of the Guidelines, the Court calculated Movant's Total Offense Level as follows:

1. Counts One (18 U.S.C. § 241) and Two (42 U.S.C. § 3631(a)) were grouped to form a single group in accordance with U.S.S.G. § 3D1.2(a) and (b);

2. The offense level for Count One, the equally most serious of the two counts, was determined according to U.S.S.G. § 3D1.3(a) as follows:

   a. **Base Offense Level**: In accordance with U.S.S.G. §§ 2H1.2(a)(2) and 2K1.4(a), the base offense level was eight . . . . . . . . . . . . . . . . . *8*

   b. **Specific Offense Characteristics:** As provided by U.S.S.G. § 2K1.4(b)(1), the offense level was increased by eighteen levels because the conduct for which Movant was convicted demonstrated he knowingly created a substantial risk of death or serious bodily injury . . . . . . . . . . . . *+18*

   c. **Adjustment for Obstruction of Justice**: Movant's conduct leading upto and during his trial warranted an enhancement for attempting to obstruct and impede justice. His offense level was increased by two levels in accordance with U.S.S.G. § 3C1.1 *+2*

   Total Offense Level . . . . . . . . . . . . . . . *28*

The Court utilized U.S.S.G. § 2K1.4, the Guideline dealing with arson, because it was deemed the most appropriate underlying offense level available in the 1989 Guidelines. Although the Court could have added an earlier omitted criminal history point to Movant's Criminal History Score at re-sentencing, it chose not to do so. Accordingly, Movant found himself in Criminal History Category II which, combined with his Total Offense Level, resulted in the following Guideline imprisonment range at resentencing:

**Imprisonment:** 87–108 months (plus a sixty month consecutive sentence on Count Three).

The sentence of imprisonment imposed by the Court was one hundred eight (108) months, to run concurrently on both Counts One and Two, along with a consecutive sentence of sixty (60) months on Count Three.

Movant appealed the Court's Judgment. The portion of the appeal challenging the sentence of imprisonment asserted the Court erred by applying the Guideline for arson because his arson conviction was overturned. The Court of Appeals affirmed. *United States v. Ramey*, No. 00–4848, 21 Fed.Appx. 111, 2001 WL 1240863 (4th Cir. Oct.17, 2001) (*Ramey III*).

In June 2002, Movant filed a motion for modification of sentence pursuant to 18 U.S.C. § 3582 based on certain amendments to the Guidelines. The same day, Movant also filed a motion pursuant to 28 U.S.C. § 2255, alleging ineffective assistance of counsel arising out counsel not urging the amendments on the Court. Following full briefing, the Magistrate Judge entered two separate PF & Rs, later supplemented by one additional PF & R, disposing of each of the motions.

The Magistrate Judge recommended denying relief on the Section 3582 motion and granting relief on the Section 2255 motion.[2] The Magistrate Judge's supple-

---

**2.** The Court **ADOPTS** and **INCORPORATES** herein the Magistrate Judge's PF & R dealing with the Section 3582 motion.

mental PF & R can be summarized as follows:

1. At the first sentencing hearing, the district court used the 1989 Guidelines, as opposed to the 1992 version in effect at the time of sentencing;

2. The district court used the underlying offense conduct of arson in determining the Guideline calculation for the 18 U.S.C. § 241 violation;

3. There was no conspiracy-to-commit-murder analogue in the 1989 Guidelines, but one existed in the 1992 version (and the 2000 version);

4. Had the district court applied the conspiracy to commit murder as the underlying offense conduct, the total offense level would have been 28;

5. Using arson as the underlying offense conduct under U.S.S.G. § 2H1.1 (civil rights conspiracy Guideline for the 2000 Guidelines), a total offense level of 26 resulted;

6. A careful review of the transcript from the first sentencing indicates neither the parties nor the Court ultimately contemplated that conspiracy to commit murder could serve as the underlying offense conduct;

7. The Court instead applied the arson Guideline present in 1989 based on the parties' putative agreement that it best represented the underlying offense conduct; and

8. It would have been inconsistent at the re-sentencing, then, to use the conspiracy to commit murder Guideline.

Despite this analysis, the Magistrate Judge observed as follows:

> Should the District Court find that it was not bound by the findings made at the first sentencing that arson was the underlying criminal offense conduct for the civil rights conspiracy, the undersigned would agree that Defendant was properly resentenced. Should the District Court determine that a conspiracy to commit murder was available as an underlying offense for the civil rights conspiracy, the base offense level in 2000 would have been the same as the base offense level to which Defendant was subject under the 1989 Guidelines using arson as the underlying offense (a level 28).

(PF & R at 3 n.1.) Nevertheless, the Magistrate Judge recommends:

> [T]he District Court **FIND** that the failure of Defendant's counsel to raise the issue of whether the 2000 version of the Guidelines should have been used at Defendant's re-sentencing fell below the objective standard of reasonableness. The court further proposes that the District Court **FIND** that there is a reasonable probability that, but for counsel's error, Defendant's sentence would have been lower. Thus, Defendant has shown the requisite prejudice to warrant collateral relief.

> For the reasons stated herein, it is respectfully **RECOMMENDED** that the District Court **GRANT** Defendant's section 2255 motion and vacate Defendant's sentence. It is further **RECOMMENDED** that the District Court appoint counsel for Defendant, direct the Probation Department to prepare a new presentence report, and schedule a new sentencing hearing.

(*Id.* at 6–7.)

The parties have filed their objections and the matter is ripe for *de novo* review.

## II. DISCUSSION

The Sixth Amendment to the *United States Constitution* provides in relevant part: "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has held the Sixth Amendment

guarantees to all criminal defendants the right to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Brown v. Lee,* 319 F.3d 162, 175 (4th Cir. 2003). In general, claims of ineffective assistance of counsel are covered by the familiar two-part test established in *Strickland.*

Under the test, the Movant first must show that his counsel's performance fell below an objective standard of reasonableness. Second, the Movant must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see Rowsey v. Lee,* 327 F.3d 335, 343–44 (4th Cir.2003); *Swisher v. True,* 325 F.3d 225, 232 (4th Cir.2003); *Hunt v. Lee,* 291 F.3d 284, 289 (4th Cir.2002). "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

The importance of the first prong cannot be overstated. In sum, it is incumbent upon the Movant to show "that 'counsel made errors so serious that counsel *was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'"* *Daniels v. Lee* 316 F.3d 477, (4th Cir.2003)(quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052). Quoting *Strickland* in part, our Court of Appeals recently stated in *Hunt v. Lee,* 291 F.3d 284, 289 (4th Cir.2002):

A court's evaluation of counsel's performance under this standard must be "highly deferential" so as not to "second-guess" the performance. To eliminate the distortions of hindsight, a court must evaluate counsel's performance "from counsel's perspective at the time." Because of the difficulty of making this inquiry in the context of the wide range of reasonable strategic approaches, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

*Id.; see also Wiggins v. Corcoran,* 288 F.3d 629, 640 (4th Cir.2002) ("informed strategic decisions are virtually unchallengeable[.]").

It is appropriate to begin with the overall quality of Mr. Cline's representation of Movant. Mr. Cline traveled personally to Ashland, Kentucky to meet with Movant in advance of resentencing. The meeting resulted in numerous objections to the PSR covering everything conceivably in issue. Mr. Cline has been a member of the bar for almost thirty years. In the Court's experience, he has consistently provided the highest level of criminal defense to those accused of serious crimes in this District. These considerations and others lead the Court ineluctably to the conclusion the choice to remain under the 1989 Guidelines was a strategic one, not one arising from error on his part.

Turning to the more substantive, and somewhat prognosticative, question of what might have occurred under the 2000 Guidelines had Movant sought their use, there is at least a reasonable degree of certitude that if the conspiracy-to-commit-murder Guideline found in U.S.S.G. § 2A1.5 was an available alternative, it would have been employed in this instance. First, over a decade ago the government was poised to request that very application absent the *Ex Post Facto* Clause. *See* Trans. of Orig. Sent. at 42 (government counsel stating "Were we to use the 1992 version of the guideline, the government

would submit that the underlying offense level—underlying offense conduct to be looked for in utilizing the civil rights conspiracy guideline would, in fact, be a conspiracy to commit murder.")

Second, Section 2H1.1(a) directed the Court to apply "the offense level from the offense guideline applicable to any underlying offense." *Id.* Application note 1 instructs that " 'Offense guideline applicable to any underlying offense' means the offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law." U.S.S.G. § 2H1.1(a), applic. n.1. While there is not an abundance of authority respecting the linking of the murder conspiracy guideline to a defendant via U.S.S.G. § 2H1.1(a), that issue would have received very close scrutiny, and perhaps resulted in a finding to Movant's detriment.

After securing the supplies for their criminal misdeeds, Movant and his co-conspirator waited until the lights went out in the trailer. They then splashed a flammable liquid against the mobile home and set it ablaze at multiple sites. As one would reasonably expect, the manufactured home was quickly engulfed in flames and a total loss in less than 20 minutes.

Both prior to the act and thereafter, Movant and his co-conspirator threatened and bragged often about what they did. The record contains several substantial indications of the necessary intent, malice, and premeditation. By example, Movant was heard to say he "couldn't stand to see a white woman living with a nigger," and that "someone should burn their house down." The Court went so far to note at the original sentencing that "It was pure fortuity that Alex Nelms and JoAnn Vance were not injured or worse in this case." (Trans. of Orig. Sent. at 48.) The Court of Appeals agreed.

Fortunately, the Court is not required to definitively resolve the question of whether it would have used Section 2A1.5 to treat Movant as a co-conspirator to murder. There are a variety of reasons *Strickland*'s first prong is not met. First, at resentencing Mr. Cline was at least partly bound by a record that included the Court's acceptance of the parties' voluntary agreement at the original sentencing to use the 1989 Guidelines. Second, Mr. Cline was also aware Movant had never challenged the appropriate edition of the Guidelines at any prior point in the near-decade long history of the case. Finally, as noted *supra*, it was clear there was a significant risk of a more severe sentence being imposed upon Movant under the 2000 edition that did not exist under the 1989 edition.

The Court cannot conclude under the circumstances that Mr. Cline erred, much less that he erred so seriously as to cease functioning as Sixth Amendment counsel. Movant has not overcome the presumption that, under the circumstances, Mr. Cline's actions were a product of sound strategy to avoid subjecting his client to a lengthier custodial sentence. This is especially apparent under *Strickland*, which requires great deference to counsel's choices and resistance to second guessing and the familiar distortions of hindsight.

Movant also has significant obstacles to overcome under *Strickland*'s second prong. The Court need not, however, address those roadblocks. Based on the foregoing, the Court DENIES both pending motions.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and the Movant.